JUDICIAL ATTORNEYS ASSOCIATION v STATE OF MICHIGAN
MAYOR OF DETROIT v STATE OF MICHIGAN

Docket Nos. 111785, 111786. Argued October 7, 1998 (Calendar No. 9).
    Reargued May 5, 1999 (Calendar No. 5). Decided July 20, 1999.
    Rehearing denied 461 Mich 1205.

The Judicial Attorneys Association and the Government Administra-
    tors Association brought an action in the Wayne Circuit Court
    against the state of Michigan, the Governor, the Attorney General,
    Wayne County, and the Wayne County Board of Commissioners,
    alleging that 1996 PA 374, the court reorganization act that merges
    Recorder's Court into the Third Circuit Court and requires Wayne
    County to assume the operational and funding responsibility for the
    former Recorder's Court functions without corresponding state
    appropriation, violates Const 1963, art 9, § 29 (the Headlee Amend-
    ment). Wayne County filed a cross-claim against the state, asserting
    that the state's imposition on the county of certain of the former
    Recorder's Court functions violates the Headlee Amendment. The
    court, Robert J. Colombo, Jr., J., granted the plaintiffs' motion for
    summary disposition, holding that Act 374 violates the Headlee
    Amendment by requiring the county to provide an "activity" that it
    did not provide before 1978 without a state appropriation. The
    court additionally held that the state's obligation to provide an
    appropriation may be triggered under the amendment even if there
    is no shift of a state program to the local level. The court refused
    to consider any reductions in the county's funding responsibilities
    to offset appropriation. The Court of Appeals, MCDONALD and
    FITZGERALD, JJ. (MARKMAN, P.J., concurring in part and dissenting in
    part), reversed. It determined that the relevant activity or service
    under the Headlee Amendment was the "operation of trial courts,"
    and concluded that the requirements of Act 374 do not impose a
    new activity or service in contravention of the Headlee Amend-
    ment. The Court further found that because the state had increased
    the proportion of its funding of judges' salaries, and that that was
    the only element of trial costs it paid in 1978, Act 374 also does not
    violate the amendment (Docket No. 201852). The county appeals.

The mayor of the city of Detroit and the city of Detroit brought an
    action in the Wayne Circuit Court against the state of Michigan and
    the Department of Management and Budget, alleging that 1996 PA

374, which required the city to assume full responsibility for funding and operations of the 36th District Court, violates the Headlee Amendment because, before 1978, the city did not fund and administer the civil and landlord and tenant divisions of the 36th District Court. The court, Robert J. Colombo, Jr., J., granted the plaintiffs' motion for summary disposition. The Court of Appeals, McDONALD and FITZGERALD, JJ. (MARKMAN, P.J., concurring in part and dissenting in part), reversed. 228 Mich App 386 (1998) (Docket No. 201850). The city appeals.

In an opinion by Justice TAYLOR, joined by Chief Justice WEAVER, and Justices CORRIGAN and YOUNG, the Supreme Court *held*:

1996 PA 374 neither imposes new activities nor increases the level of activities on local units of government. Because in 1978 and under Act 374, the state's only contribution to the activity at issue relates to the payment of judicial salaries, these matters are not subject to an analysis to determine whether the act decreases the state's proportionate share of the necessary costs of the activities it requires of these two local units.

1. The Headlee Amendment, § 29, provides, inter alia, that a new activity or service or an increase in the level of any activity or service beyond that required by law existing at the time the amendment was ratified in 1978 may not be required by the Legislature or any unit of local government unless a state appropriation is made and disbursed to pay the unit for any necessary increased costs. The provision is triggered only when the state mandates a new activity by requiring local units of government to perform an activity that the state did not require local units to perform in 1978 or when it increases the level of an activity from the level that it required local units to perform in 1978. The intended limitations of § 29 on the state's discretion do not include requiring the state to fully fund an activity that was locally funded in 1978, but is later imposed on a different local unit. A local unit required to assume funding for an activity it previously did not fund, but which local units were required to fund in 1978, would receive the state-financed proportion provided in 1978.

2. 1996 PA 374 neither mandates new activities nor increases the level of activities relating to trial court operations, even if a particular local unit had not previously performed it. Rather, it simply requires the two units at issue to do what the state required every local unit to do in 1978: fund the local district or circuit court, except for the portion of judicial salaries paid by the state. In 1978 and under Act 374, the state's only contribution to the activity at issue relates to payment of judicial salaries. Under the plain language of § 29's final sentence, the state's only contribution to the activity at issue, however defined, is not subject to an analysis

under the first sentence of § 29 to determine if Act 374 decreases the state's proportionate share of the necessary costs of the activities that it mandates. Thus, it was unnecessary for the Court of Appeals to reach the issue.

Affirmed in part and vacated in part.

Justice CAVANAGH, joined by Justices BRICKLEY and KELLY, dissenting, stated that the Headlee Amendment obligations contained in the second sentence of Const 1963, art 9, § 29 run from the state to each unit of local government individually. The Court of Appeals erred in defining the relevant activity or service at issue in this case as trial court operations. Rather, the relevant activities or services are former Common Pleas Court functions and former Recorder's Court functions.

Examining units of local government in the collective for purposes of determining whether the state has required them to undertake new or increased activities is inconsistent with the language and purpose of § 29. Defining the relevant activity or service in question as trial court operations is simply too broad a category. If all trial court functions fall under the broad category of trial court operations, the state is free to impose a multitude of laws and regulations on a local unit without an appropriation for the resulting increased costs. While 1996 PA 374 requires that the city of Detroit provide former Common Pleas Court functions and that Wayne County provide former Recorder's Court functions, activities previously performed by other units of local government, the state's funding obligation under the Headlee Amendment nevertheless is implicated because the activities are new to those particular units of local government. Consequently, the state should be required to make appropriations for any necessary increased costs resulting from the requirements of Act 374.

City of Detroit Law Department (by *Phyllis A. James*, Corporation Counsel, *Joanne D. Stafford*, Chief Assistant Corporation Counsel, and *Dennis A. Mazurek*, Supervising Assistant Corporation Counsel); *Dickinson, Wright, P.L.L.C.* (by *Peter H. Ellsworth, Joseph C. Marshall, III*, and *Jeffery V. Stuckey*), for the plaintiffs-appellants city of Detroit.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Deborah Anne Devine* and *Matthew H. Rick*, Assistant Attor-

neys General, for defendants-appellees state of Michigan.

*Edward Ewell, Jr.*, Wayne County Corporation Counsel; *Fink Zausmer, P.C.* (by *David H. Fink, Gary K. August, Ruben Acosta,* and *Amy M. Sitner*), for defendants/cross-plaintiffs/appellants Wayne County and Wayne County Board of Commissioners.

TAYLOR, J. In these appeals, the city of Detroit and Wayne County challenge certain provisions of 1996 PA 374, a court reorganization act, on the basis that they violate Const 1963, art 9, § 29 (the Headlee Amendment). We conclude that Act 374 neither imposes new activities nor increases the level of activities on local units. Further, because in 1978 and under Act 374, the state's only contribution to the activity at issue relates to the payment of judicial salaries, these matters are not subject to an analysis to determine whether Act 374 decreases the state's proportionate share of the necessary costs of the activities it requires of these two local units. We accordingly affirm in part and vacate in part the Court of Appeals opinion.

I

According to its title, Act 374 is designed to revise the organization and jurisdiction of the courts. It is an effort to reorganize the state trial courts and to provide a uniform funding mechanism. For purposes of these appeals, relevant features of Act 374 are that it abolishes Detroit Recorder's Court and merges it with the Third Circuit Court and that it makes the funding units' responsibilities for the funding of the Third Circuit and the 36th District Court consistent with the

responsibilities of funding units of all other circuits and districts. Sections 9931, 8271, and 591. Specifically, Act 374 requires Detroit to fund 36th District Court and Wayne County to fund the newly reconstituted Third Circuit Court. Detroit and Wayne County contend that Act 374's imposition of these responsibilities violates the Headlee Amendment because it places funding obligations on them that they were not previously required to shoulder.

In both cases, the trial court held that Act 374 violated the Headlee Amendment. The cases were consolidated on appeal and the Court of Appeals reversed, concluding that Act 374 did not violate the Headlee Amendment. 228 Mich App 386; 579 NW2d 378 (1998). We granted leave to consider whether Act 374 violates the Headlee Amendment.[1] 457 Mich 884 (1998).

The relevant Headlee provision, Const 1963, art 9, § 29, states:

> The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law. A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs. The provision of this section shall not apply to costs incurred pursuant to Article VI, Section 18.

---

[1] We also granted leave to consider whether Act 374 violates the Separation of Powers Clause, Const 1963, art 3, § 2, or the public employee relations act, MCL 423.201 *et seq.*; MSA 17.455(1) *et seq.* Our decisions regarding those issues are separately reported at 459 Mich 291; 586 NW2d 894 (1998).

Drawing from this Court's previous decisions, the Court of Appeals aptly articulated the parameters of § 29 at 396-398:

> The first sentence of this provision prohibits reduction of the state proportion of necessary costs with respect to the continuation of state-mandated activities or services. The second sentence requires the state to fund any additional necessary costs of newly mandated activities or services and increases in the level of such activities or services from the 1978 base year. This language does not guarantee that local units' spending levels will not increase from the 1978 level. Rather, the Headlee Amendment only guarantees that the state will not reduce its proportion of the necessary costs of existing activities or services, and that the state will pay entirely for necessary costs when it mandates new activities or services or to the extent the state increases the level of an existing activity or service. Increased levels of local spending attributable to other causes, e.g., inflation or the greater utilization of a program by the public, are not addressed by this provision of the Headlee Amendment.
>
> The Michigan Supreme Court has interpreted § 29 to " 'reflect an effort on the part of the voters to forestall any attempt by the Legislature to shift [fiscal] responsibilities to the local government . . . .' " *Schmidt v Dep't of Ed*, 441 Mich 236, 250; 490 NW2d 584 (1992), quoting *Durant v State Bd of Ed*, 424 Mich 364, 379; 381 NW2d 662 (1985). The two sentences of § 29 "must be read together '[b]ecause they were aimed at alleviation of two possible manifestations of the same voter concern . . . .' " *Schmidt, supra* at 251, quoting *Durant, supra* at 379. To make the necessary comparison between state aid provided during the Headlee Amendment base year (1978) and a later year at issue, the *Schmidt* Court considered, at length, three possible formulations: the "state-to-state" formulation, the "local-to-local" formulation, and the "state-to-local" formulation. It ultimately adopted the "state-to-local" formulation. This method involves comparing "the ratio of total state aid for a required activity to total necessary costs for the required activity in the base year . . . with the ratio of state aid to an individual local unit of government for the activity to the

necessary costs of that unit for the activity in the year of
challenged funding." *Schmidt, supra* at 249. Under this for-
mulation, "[t]he state is obligated to afford each unit provid-
ing the activity or service the same proportion of funding
that the state provided on a statewide basis in the year that
the Headlee Amendment was ratified." *Id.* at 250; see also
*Durant v Michigan*, 456 Mich 175, 187; 566 NW2d 272
(1997).

In *Schmidt, supra* at 252, this Court discussed the
voters' intent in ratifying the Headlee Amendment:

> The state-to-local formulation satisfies the voters' intent
> in enacting the Headlee Amendment. When the voters rati-
> fied the Headlee Amendment, they sought to ensure that
> when the state mandates a program, funds are provided to
> the local government to pay for that program. The state-to-
> local method of calculating the state's obligation achieves
> the voters' desire to secure a minimum level of funding for
> the local government unit for mandatory programs and to
> link the mandating of programs with the necessity for tax-
> ing to pay for those programs. This approach also creates
> the appropriate balance between the state's desire for dis-
> cretion in allocating funds and the desire of the local units
> of government for minimum funding. The state-to-local ratio
> provides a uniform allocation of resources for mandatory
> programs. The state is free to supplement that minimum
> funding on the basis of its perception of need, but the local
> government is guaranteed its proportionate share.

After reiterating these principles, the Court of
Appeals proceeded to make a Headlee Amendment
analysis of Act 374. The Court of Appeals concluded
that "trial court operations" was the relevant activity
or service under § 29. 228 Mich App 401-402. It found
that Act 374 requires counties to fund the operation
of the circuit courts, district units to fund the opera-
tion of district courts, and the state to fully fund cir-
cuit and district court judicial salaries. *Id.* at 402-403.
It found that in 1978, state law mandated that local

units fund and operate circuit and district courts and that the state subsidized a portion of judicial salaries. *Id.* at 405. It then concluded that Act 374 neither mandated new activities for local units nor increased the level of any activity required of local units. *Id.* Finally, it concluded that, despite incomplete information to perform the relevant equations, it was able to determine that Act 374 did not decrease the state-financed proportion of necessary costs of trial court operations to either Detroit or Wayne County from that provided on a statewide basis in 1978. *Id.* at 407-408.

II

On appeal here, the parties do not dispute the Court of Appeals findings regarding what Act 374 requires of local units and what state law required of local units in 1978 in terms of trial court operations. Rather, they dispute whether the Court of Appeals correctly identified the relevant activity under § 29 as "trial court operations." The parties' briefs and arguments before this Court suggest that these appeals turn on how the relevant activity is defined.

A

However, there is an underlying issue that neither the parties nor the Court of Appeals explicitly addressed: what the proper frame of reference is for deciding whether a mandated activity constitutes a "new activity" or "increase in the level of any activity." Resolution of this issue is important because § 29 distinguishes between the continuation of an activity mandated in 1978 and the imposition of a new activity or increase in the level of an activity. Section 29 prohibits the state from reducing its proportion of the

necessary costs of *existing activities* while it requires the state to pay the increased necessary costs in full when it mandates *new activities* or mandates activities at an *increased level*. Specifically, the underlying question is: does § 29 address mandated activities that are new or required at an increased level from the perspective of a particular local unit or from the perspective of local units collectively? That is, is the second sentence of § 29 triggered by any mandate that requires a particular local unit to perform an activity that is new to it (or at an increased level) or only by a mandate that requires local units to perform an activity that the state did not previously require local units to perform (or at an increased level from that previously required of local units)? For ease of reference we will refer to the first option as "the broad interpretation" (an activity is "new" under § 29 merely if it is new to a particular unit) and the second option as "the narrow interpretation" (an activity is "new" under § 29 only if it is new to local units collectively, i.e., an activity the state did not previously require local units to perform).

In *Schmidt*, 441 Mich 253, in the context of discussing the strengths of the state-to-local formulation,[2] we offered two examples that shed light on this question:

> For example, if a district in existence in the base year was not providing a mandatory program when the Headlee Amendment took effect, this method would entitle the district to the same proportionate share as every other local

---

[2] The dissent correctly points out that *Schmidt* addressed the first sentence of § 29. However, this does not make *Schmidt* inapplicable to an analysis of the second sentence of § 29. In fact, the *Schmidt* Court specifically reiterated that "the two sentences must be read together '[b]ecause they were aimed at the alleviation of two possible manifestations of the same voter concern . . . .' " *Id.* at 251, quoting *Durant*, 424 Mich 379.

unit that previously provided the programs. This formulation also simplifies funding where new districts are created by consolidation, or reorganization, or otherwise. If the newly organized district adds a program that was "mandated" when the Headlee Amendment took effect, any district providing the program is then entitled to the same proportionate share as every other unit providing the activity or service. Thus, the anomaly of funding at either zero or one hundred percent (pursuant to the second sentence of § 29) is avoided. New districts, like previously existing districts, would be entitled to the same proportionate share of state funding.

In both these examples, from the perspective of the particular unit, it might be argued that the state mandated a "new activity." But in both examples, this Court concluded that the particular local unit would not be entitled to one hundred percent funding as required under the second sentence of § 29 when the state imposes a "new activity." Rather, we concluded that these local units would only be entitled to the same proportionate share of state funding that other local units received for that activity. We concluded that these examples involved the simple continuation of an activity that the state required of local units in 1978, and did not impose on local units a new activity (or an increased level of activity), even though these particular local units had not previously performed these activities.[3] In short, we adopted the narrow interpretation. Under the narrow interpretation of § 29, the relevant frame of reference is whether a mandated activity is new (or at an increased level) to

---

[3] We note that Act 374 similarly mandates the continuation of an activity already required of local units. Act 374 requires Detroit and Wayne County to do what the state required every local unit to do in 1978: fund the local district or circuit court, respectively, with the exception of the portion of judicial salaries paid by the state.

local units collectively. We thus concluded that the second sentence of § 29 is only triggered when the state mandates a new activity by requiring local units to perform an activity that the state did not require local units to perform in 1978 or when it increases the level of an activity from the level that it required local units to perform in 1978.[4] Two corollaries flow from this conclusion: 1) a requirement that a particular local unit fund an activity that was locally funded in 1978 would not constitute a "new activity" under § 29, regardless of whether the particular local unit previously funded this activity; and 2) a requirement that a particular local unit fund an activity at a level that was locally funded in 1978 would not constitute an "increase" in the level of activity, regardless of whether the particular unit previously funded the activity at this level.

We acknowledge that these conclusions are drawn from examples in *Schmidt*. Examples in an opinion are, by definition, dicta. However, these examples are consistent with both the language of § 29 and this Court's holding in *Schmidt*.

The second sentence of § 29 states in pertinent part:

A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of *units* of Local Government, unless a state appropriation is made and disbursed to pay *the unit* of Local Government for any necessary increased costs. [Emphasis added.]

---

[4] The issue is whether the state required any local unit to perform an activity in 1978. If it did, it is irrelevant how many or how few units were required to perform the activity. Under our approach, a subsequent requirement that other local units perform the same function at the same level would not constitute a "new" or "increased" activity.

The use of the plural "units" in the first phrase of this sentence indicates that the state is not to require activities that are new or at an increased level from the perspective of local units collectively. Of course, the use of the singular "the unit" in the second phrase of this sentence indicates that the proper remedy for the imposition of such a new or increased activity is to pay the increased necessary costs to each particular unit.[5] But the initial question whether a statute mandates a new activity or an increased level of activity is to be answered by considering local units collectively, rather than a particular local unit, according to the plain meaning of the word "units" in the first phrase of the second sentence of § 29. Thus, this Court's analysis of the two examples in *Schmidt* is consistent with the language of § 29.

Moreover, the principles underlying these examples clearly follow from our holding in *Schmidt* that "the voters intended neither to freeze legislative discretion nor to permit state government full discretion in its allocation of support for mandated activities or services" and that only the state-to-local formulation

---

[5] The use of the singular "the unit" in the second phrase of this sentence also indicates that the proper remedy for a violation of the first sentence of § 29 (i.e., a reduction of the state proportion of the necessary costs of a continuing activity) is to pay the individual unit. We fully subscribe to the *Schmidt* Court's adoption of the state-to-local formulation and rejection of the state-to-state formulation in determining whether there has been a violation of the first sentence of § 29. We agree that § 29 accordingly "impose[s] an obligation on the state vis-à-vis each unit of local government with respect to mandated activities as well as new requirements." *Schmidt, supra* at 251. Any suggestion otherwise by the dissent is incorrect. There does not appear to be any dispute that with respect to continuing activities, the state must pay its proportion of the necessary costs (as determined under the state-to-local formulation) and that with respect to new or increased activities, the state must pay for all increased necessary costs. The issue before us, on which we and the dissent disagree, is what constitutes a "new" or "increased" activity.

"gives full effect to the language and advances the purposes that voters sought to achieve in ratifying the Headlee Amendment." *Id.* at 242, 249-250. Specifically, as noted above, we held that the state-to-local formulation

> creates the appropriate balance between the state's desire for discretion in allocating funds and the desire of the local units of government for minimum funding. The state-to-local ratio provides a uniform allocation of resources for mandatory programs. [*Id.* at 252.]

Assessment of the broad and narrow interpretations of "new activity" on the basis of these criteria— 1) balancing state discretion in allocating funds and minimum funding guarantees for local units, and 2) uniform allocation of resources—demonstrates that only the narrow interpretation meets these dual purposes of § 29.

First, we consider the effect of these competing interpretations on the goal of not freezing legislative discretion. In *Schmidt*, we discussed several ways that the Headlee Amendment limits the state's discretion:

> First, it expresses the desire to prohibit the state from requiring new or expanded activities without fully funding them. . . . Second, the language evidences a purpose of preventing the state from reducing "the proportion of state spending in the form of aid to local governments." . . . Finally, the language embodies an antishifting purpose that prevents the state from shifting "the tax burden to local government." [*Id.* at 254, quoting Const 1963, art 9, § 25.]

We reiterated that the two sentences of § 29 must be read together and that they " 'clearly reflect an effort on the part of the voters to forestall any attempt by the Legislature to shift responsibility for services to

the local government, once its revenues were limited by the Headlee Amendment, in order to save the money it would have had to use to provide the services itself.' " *Id.* at 257, quoting *Durant, supra,* 424 Mich 379. Similarly, in *Livingston Co v Dep't of Management & Budget,* 430 Mich 635, 644; 425 NW2d 65 (1988), we stated:

> [The Headlee Amendment's overall] plan is quite obvious. Having placed a limit on state spending, it was necessary to keep the state from creating loopholes either by shifting more programs to units of local government without the funds to carry them out, or by reducing the state's proportion of spending for "required" programs in effect at the time the Headlee Amendment was ratified.

We further suggested that legislative changes that do not create such loopholes do not implicate the Headlee Amendment. For example, we held, at 645:

> While the state can, and sometimes does, mandate higher standards, benefits, and so forth, it does not necessarily profit from increasing these standards, and, therefore, the kind of escape hatch for the state that the Headlee Amendment was intended to head off is not created.

These holdings indicate that § 29 primarily addresses shifts from the state to local units. With respect to shifts of responsibility among local units, § 29 only guarantees that each local unit will receive the state-financed proportion of funding provided on a statewide basis in 1978.

The Headlee Amendment simply does not speak to all potential shortcomings of funding statutes.[6] To the

---

[6] The dissent criticizes our approach by providing two examples: 1) the state shifting activities formerly performed by several units of local government to a single unit, and 2) the state requiring every local unit to establish a separate "Recorder's Court" for criminal prosecutions. Were

extent that the Headlee Amendment does not address perceived inequities of statutes, parties may seek relief through the political process.[7]

These authorities indicate that the intended limitations of § 29 on the state's discretion do not include requiring the state to fully fund an activity that was locally funded in 1978, but is later imposed on a different local unit. The broad interpretation would result in the imposition of such a requirement and would therefore limit the Legislature's discretion beyond that intended by the Headlee Amendment. The narrow interpretation is consistent with § 29's

---

these scenarios to occur, under our approach, the state would have to provide its proportion of the necessary costs to the local unit for these continuing activities (under the state-to-local formulation), but it would not have to fully fund them as "new" activities. If such legislation were to pass, and were perceived to be unfair, there would surely be, as Chief Justice CAVANAGH suggested in his dissent in *Schmidt*, a political price to pay. 441 Mich 280. In short, this type of inequity is simply not addressed by § 29 and is left to the "democratic verdict of the voters." *Id.* Further, the dissent's invocation of the Legislature doing something "unthinkable" is not a new criticism. In fact, it can be seen in this country as early as *Gibbons v Ogden*, 22 US (9 Wheat) 1; 6 L Ed 23 (1824), where the fear of irresponsible legislation was urged as a reason for judicial action. United States Supreme Court Chief Justice John Marshall memorably dispatched this genre of argument:

The wisdom and the discretion of [the Legislature, its] identity with the people, and the influence which [legislators'] constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied, to secure them from its abuse. They are the restraints on which the people must often rely solely, in all representative governments. [*Id.* at 197.]

[7] We also note that Justice CAVANAGH's concern in this case with the "wide latitude" given to the state is inconsistent with his dissenting opinion in *Schmidt*. There, he noted that "it would simply be unreasonable to suppose that the Headlee Amendment was designed or intended to prohibit or forestall any conceivably unwise, unfair, or even evil state fiscal policy that might be imagined." *Id.* at 279. He also stated that he embraced the proposition that "to the extent the state is not governed by constitutional restraints, it is free to do whatever it wants to do, subject only to the democratic verdict of the voters." *Id.* at 280.

focus on shifts from the state to local units and does not similarly hamper the Legislature's discretion in ways not envisioned by the Headlee Amendment.

The intent to assure minimum funding at 1978 levels would be met by either interpretation. Under the narrow interpretation, a local unit required to assume funding for an activity it previously did not fund, but which local units were required to fund in 1978, would receive the state-financed proportion provided in 1978. Under the broad interpretation, a local unit required to assume funding for an activity that it previously did not fund would receive one hundred percent state funding, even though the activity was locally funded in 1978 and other local units funding the same activity are guaranteed only the state-financed proportion provided in 1978. *Minimum* funding is guaranteed under both these readings of § 29; however, the broad interpretation is obviously more advantageous to the particular local unit because it would go beyond providing minimum funding.

In light of these observations, we next consider the intended *balance* between the dual goals of a) preserving the Legislature's ability to enact necessary and desirable legislation in response to changing times and conditions and b) guaranteeing a predictable level of minimum funding. The broad interpretation defeats the first goal by placing limitations on legislative discretion beyond those imposed by § 29, and distorts the second goal by providing in some cases full state funding where § 29 guarantees only the state-financed proportion provided in 1978. The broad interpretation would therefore undermine the intended balance of these dual goals. The narrow interpretation, in contrast, is consistent with both

§ 29's focus on shifts from the state to local units and
§ 29's guarantee of minimum funding. Therefore, only
the narrow interpretation of § 29 honors the intended
balance between legislative discretion and guaranteed
minimum funding.

Further, the broad interpretation clearly under-
mines the intent to provide a uniform allocation of
resources. Under the broad interpretation, two local
units providing the same activity could receive widely
different amounts of state funding depending on
whether the unit performed the activity in 1978 (in
which case it would receive the state-financed pro-
portion provided in 1978) or was only later assigned
the activity (in which case it would receive one hun-
dred percent state funding). The narrow interpreta-
tion of § 29 would not create such friction-producing
funding anomalies. Under the narrow interpretation,
with respect to activities that the state required local
units to perform in 1978, any local unit required to
perform that activity is entitled to the same state pro-
portion of funding that was provided in 1978. Thus,
only the narrow interpretation would further the goal
of uniform allocation of state resources.

For these reasons, we hereby adopt the narrow
interpretation. We hold that the second sentence of
§ 29 is only triggered by a mandate that requires local
units to perform an activity that the state previously
did not require local units to perform or at an
increased level from that previously required of local
units.

B

In applying this holding, we again note that the par-
ties do not dispute the Court of Appeals findings

regarding what Act 374 requires of local units and what state law required of local units in 1978 in terms of trial court operations. We agree with the Court of Appeals analysis of these issues and hereby adopt the following portion of its opinion:

> Act 374, § 9931 abolishes the Recorder's Court[12] and merges it with the Third Circuit Court effective October 1, 1997. Act 374, § 591 requires the county board of commissioners in each county to annually appropriate funds for the operation of the circuit court in that county. Act 374, § 555 requires the state to pay the salary of circuit judges and to reimburse the county if it pays an additional salary within prescribed limitations. Act 374, § 8271 requires the governing body of each district funding unit to annually appropriate funds for the operation of the district court in that district. Act 374, § 8104 also requires district funding units to finance and operate the district courts. Act 374, § 8202 requires the state to pay the salary of district judges and to reimburse the local unit if it pays an additional salary within prescribed limitations. Accordingly, under Act 374, the state mandates that counties pay for the operation of the circuit courts, that district units pay for the operation of the district courts, and that the state pay circuit court and district court judicial salaries.

---

[12] The Recorder's Court is a court unique to Detroit. It is "a court of limited jurisdiction and has jurisdiction for the prosecution of crimes committed within the City of Detroit only." *People v Young (On Remand)*, 220 Mich App 420, 433; 559 NW2d 670 (1996). In every other county in Michigan, crimes committed within a city are prosecuted in the circuit court.

---

> A Headlee Amendment analysis next requires that we compare this with the operation of trial courts in 1978—the Headlee Amendment base year. In *Grand Traverse Co v Michigan*, 450 Mich 457, 473-474; 538 NW2d 1 (1995), the Michigan Supreme Court stated:
>
> "Despite the fact that the courts have always been regarded as part of state government, they have operated historically on local funds and resources. An unbroken line of cases stretching back 130 years recognizes the practice

of imposing the costs of operating the courts on local funding units."

It stated, "[t]he widespread acceptance of the principle of funding most trial court expenses through local funding units has continued until today." *Id.* at 476. See also *Wayne Circuit Judges v Wayne Co*, 15 Mich App 713, 722, n 10; 167 NW2d 337 (1969),  rev'd 383 Mich 10, 24; 172 NW2d 436 (1969)  ("the county is the proper arm of state government upon which the necessary expense of operating the circuit court devolves"), opinion of the Court superseded and the opinion by DETHMERS and BLACK adopted as the opinion of the Court on rehearing, and the opinion of the Court of Appeals affirmed [On Rehearing] 386 Mich 1; 190 NW2d 228 (1971).  In *Frederick v Presque Isle Co Circuit Judge*, 439 Mich 1, 6; 476 NW2d 142 (1991),  the Court stated:

"Traditionally, the county has been the primary unit in directing Michigan's criminal justice system.

"[The *Frederick* Court cites several examples of statutes requiring local funding for trial court activities.]"

*    *    *

In *Employees & Judge of the Second Judicial Dist Court v Hillsdale Co*, 423 Mich 705, 713; 378 NW2d 744 (1985),  the Court stated that MCL 600.9947;  MSA 27A.9947, added by 1980 PA 438, was an attempt by the state to eliminate local funding of state judicial functions. *Second Dist Court* thus clearly recognizes that, before that 1980 act, the state effectively mandated local funding of trial court operations.

Before Act 374 there was no particular statute that explicitly stated that local units were responsible for funding trial courts. Rather, as set forth above, a number of statutes addressing particular aspects of trial court operations clearly implied that local units were to fund trial courts. The mosaic of these various statutes, and the strong tradition of local funding of trial courts recognized in case law, demonstrates that state law effectively mandated that local units fund trial courts in 1978.[13] Accordingly, we conclude that in 1978 state law mandated that local units fund trial courts.

[13] We note that in determining "state law," the *Durant* Court considered the well-established tradition of local control over school operation. *Durant*, 424 Mich 385, n 14.

The state contends that complete financial records from the pre-Headlee Amendment period are not available; however, it is apparently undisputed that the state's only contribution to trial court operations in 1978 was with respect to a portion of judicial salaries. Accordingly, in 1978 local units financed and operated the circuit and district courts and the state subsidized a portion of judicial salaries. [228 Mich App 402-405.]

These findings—that, both in 1978 and under Act 374, local units were required to fund trial court operations as a whole with the exception of judicial salaries[8]—compel the conclusion that Act 374 neither mandates new activities nor increases the level of activities relating to trial court operations. Act 374 does not require any new or increased activities of local units. Rather, it simply requires the two units at issue to do what the state required every local unit to do in 1978: fund the local district or circuit court, except for the portion of judicial salaries paid by the state. The conclusion that Act 374 does not mandate any new or increased activities holds regardless of whether we define the relevant activity as "trial court operations" or by more specific categories because local units funded trial court operations as a whole (with the exception of judicial salaries) in 1978. That is, even if we were to separately consider the more specific activities included in "trial court operations," each activity required under Act 374 was required of local units in 1978. Therefore, Act 374's imposition of

[8] As noted above, the state funded a portion of judicial salaries in 1978 and fully funds judicial salaries under Act 374. Moreover, as discussed below, judicial salaries are not subject to a Headlee analysis.

such activities on local units would not constitute a
new activity or increase in activity required of local
units, even if a particular local unit had not previ-
ously performed it. Accordingly, for purposes of
applying the second sentence of § 29 we need not
decide whether the Court of Appeals properly identi-
fied the relevant activity as "trial court operations."

## III

Ordinarily, for purposes of the first sentence of
§ 29—determining whether the state has reduced the
state-financed proportion of the necessary costs of
any existing state-mandated activity—it would be nec-
essary to identify the relevant activity. Here, however,
it is undisputed that, in 1978 and under Act 374, the
state's only contribution to the activity at issue relates
to payment of judicial salaries. The final sentence of
§ 29 states that it "shall not apply to costs incurred
pursuant to Article VI, Section 18." Const 1963, art 6,
§ 18  governs judicial salaries. Therefore, under the
plain language of § 29's final sentence, the state's only
contribution to the activity at issue, however defined,
is not subject to an analysis under the first sentence
of § 29 to determine if Act 374 decreases the state's
proportionate share of the necessary costs of the
activities that it mandates. Thus, it was unnecessary
for the Court of Appeals to reach this issue and is
unnecessary for us to do so either. We accordingly
vacate the Court of Appeals analysis of this issue and
need not define the relevant activity here.

### CONCLUSION

For these reasons, we hold that Act 374 neither
mandates a new activity nor increases the level of an

activity on Detroit or Wayne County and that it is not subject to an analysis of whether it decreases the state-financed proportion of the necessary costs of an activity with respect to these two units. Accordingly, we affirm in part and vacate in part the Court of Appeals decision.

WEAVER, C.J., and CORRIGAN and YOUNG, JJ., concurred with TAYLOR, J.

CAVANAGH, J. (*dissenting*). The centerpiece of the majority's analysis is two examples from *Schmidt v Dep't of Ed*, 441 Mich 236, 253; 490 NW2d 584 (1992), a case that addressed the *first* sentence of Const 1963, art 9, § 29.[1] While acknowledging that the *Schmidt* examples are, "by definition, dicta," *ante* at 600, the majority believes that they are representative of both the language and purpose of § 29. Because the language of § 29, its underlying purpose, and our opinion in *Schmidt* all belie the majority's contentions, I respectfully dissent. I would hold that the Headlee Amendment obligations contained in the second sentence of § 29 run from the state to each unit of local government individually. I would also hold that the Court of Appeals erred in defining the relevant activity or service at issue in this case as "trial court operations."

I. THE LANGUAGE OF CONST 1963, ART 9, § 29

The starting point for any constitutional analysis is the language of the constitution itself. The primary

---

[1] The first sentence of the majority opinion in *Schmidt* explicitly stated that "[t]he question presented is the proper interpretation of the *first* sentence of § 29 of the Headlee Amendment . . . ." 441 Mich 241 (emphasis added).

rule of constitutional construction is that of the "common understanding" of the voters approving the constitution. The rule has been described by Justice COOLEY as follows:

> A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. "For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, *and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed." [*Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971), quoting Cooley, Constitutional Limitations, p 81 (emphasis added).]

Moreover, the Court must give force to all the words used in a constitutional provision. "Neither the legislature, nor this Court, has any right to amend or change a provision in the Constitution." *Pillon v Attorney General,* 345 Mich 536, 547; 77 NW2d 257 (1956). Thus, the Court must avoid any construction that would invalidate portions of the language used in the provision under review.

Unfortunately, the majority has strayed from these time honored rules of construction. The majority's conclusion that "the relevant frame of reference [under the second sentence of § 29] is whether a mandated activity is new (or at an increased level) to local units collectively," *ante* at 599-600, is contradicted by the specific language of the second sentence:[2]

---

[2] The complete language of § 29 is as follows:

> A new activity or service or an increase in the level of
> any activity or service beyond that required by existing law
> shall not be required by the legislature or any state agency
> of units of Local Government, unless a state appropriation
> is made and disbursed to pay *the unit of Local Government*
> for any necessary increased costs. [Emphasis added.]

The italicized portion of this sentence explicitly refers
to local unit in the singular. This use of the singular
"suggests that the section was intended to impose an
obligation on the state vis-à-vis *each unit of local gov-
ernment* with respect to mandated activities or ser-
vices as well as new requirements." *Schmidt*, 441
Mich 251 (emphasis added). The Court addressed this
very issue in *Schmidt*:

> The first sentence [of art 9, § 29] focuses on a single pro-
> portionate obligation by the state measured during the base
> year, i.e., the year that the Headlee Amendment became
> effective. The only language in § 29 that speaks directly to
> payment occurs in the second sentence, which requires a
> "state appropriation . . . to pay *the* unit of Local Govern-
> ment for any necessary increased costs." (Emphasis added.)
> This language references a singular unit and a singular gov-
> ernmental body. It suggests that the framers intended, and
> the voters understood, that the state's obligation ran to
> each unit of local government. [*Id.*][3]

---

The state is hereby prohibited from reducing the state financed
proportion of the necessary costs of any existing activity or service
required of units of Local Government by state law. A new activity
or service or an increase in the level of any activity or service
beyond that required by existing law shall not be required by the
legislature or any state agency of units of Local Government,
unless a state appropriation is made and disbursed to pay the unit
of Local Government for any necessary increased costs. The provi-
sion of this section shall not apply to costs incurred pursuant to
Article VI, Section 18.

[3] Ironically, the majority examines certain examples from the *Schmidt*
opinion, but it ignores the remainder of the opinion's logic, which, in dis-
cussing the first sentence of § 29, repudiates the exact view that is
adopted by the majority. See *id.* at 259-260 ("[T]he statewide approach

The majority believes that "[t]he use of the plural 'units' in the first phrase of this sentence indicates that the state is not to require activities that are new or at an increased level from the perspective of local units collectively." *Ante* at 601. However, such a reading of § 29 does not comport with the common understanding of the terms selected by the drafters and ratified by the public. To reiterate, the second sentence of § 29 states:

---

permits the state to shift funding from some districts to others while still requiring those districts to carry out mandated programs. This separation of the taxing question from the programing question is contrary to one of the primary purposes of the Headlee Amendment").

The idea that the second sentence should be approached from the perspective of an individual unit of local government was also clearly expressed in both of the *Schmidt* dissents. In my own dissent, I explained:

In a noteworthy contrast, the second sentence of § 29, dealing with state financing of new or increased state-required activities or services, refers to "unit of Local Government" in the singular, by way of prohibiting the state from adding new program obligations or increasing the level of existing program obligations on local governments, "unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs." . . . [I]t is entirely logical for the requirements of the second sentence of § 29 to apply on a local unit basis. The essence of the second sentence is to require that *all* new, increased costs resulting from new or increased state program requirements be one hundred percent funded by the state. This could not occur unless every unit's increased costs in that regard were funded one hundred percent. [*Id.* at 266, n 2, (opinion of CAVANAGH, C.J.).]

Justice LEVIN's dissent also came to a similar conclusion, albeit for a different reason:

The phrase "taken as a group" set forth in § 30 does not appear in § 29; for purposes of § 29, units of local government are not to be taken as a group. [*Id.* at 291, n 21.]

Thus, it seems the only thing that seven justices could agree on in *Schmidt* was that the second sentence required consideration from the perspective of *each individual unit* of local government. I believe this clear consensus undermines any reliance on *Schmidt* by the majority.

> A new activity or service or an increase in the level of
> any activity or service beyond that required by existing law
> shall not be required by the legislature or any state agency
> of units of Local Government, unless a state appropriation
> is made and disbursed to pay the unit of Local Government
> for any necessary increased costs. [Emphasis added.]

Read in the context of the entire sentence, the use of
the plural "units" in the first part of the sentence is
merely a recognition that there are a variety of differ-
ent units of local government.[4] Unlike the singular
state government, there are different units of local
government, including those governing cities, coun-
ties, townships, school districts, and the like. Indeed,
to read the reference to "units" any other way would
require one to effectively ignore other language
appearing in the sentence.

Section 29 requires in part that the state pay for "an
increase in the level of any activity or service beyond
that required by existing law . . . ." However, the
majority's interpretation effectively eliminates the ver-
biage. Under its analysis, it does not seem possible
for a locality to recover for an "increased" obligation
foisted on it by the state. If the required activity has
already been undertaken by the collective local gov-

---

[4] The language of the second sentence of § 29 is in notable contrast
with that of § 30 of the Headlee Amendment:

> The proportion of total state spending paid to all units of Local
> Government, *taken as a group*, shall not be reduced below that
> proportion in effect in fiscal year 1978-79. [Emphasis added.]

If the drafters had meant for the second sentence to apply to units of
local governments collectively, they could have made § 29 abundantly
clear by adding the modifying phrase "taken as a group" after units of
local government, just as they did in § 30. See *Schmidt*, 441 Mich 272-273
(CAVANAGH, C.J., dissenting) (adding the words "taken as a group" after
"units of local government" would have suggested "that only activities or
services required of *all* units of local government were implicated").

ernments in the past, "§ 29 only guarantees that each local unit will receive the state-financed proportion of funding provided on a statewide basis in 1978." *Ante* at 603. Therefore, even if the city of Detroit's expenses increased tenfold because of the court reorganization plan, the city would not be able to recover "for any necessary increased costs" apart from the percentage the state was already paying before 1978. In other words, there is never an "increase" in an activity; rather, there is only a change in the proportionate share required by the state. This approach is simply incompatible with the specific language of § 29, and it violates the rule of constitutional construction that we must give force to the actual language of the constitutional provision.[5]

In sum, I believe the majority's interpretation of the second sentence of § 29 strays from the actual text of the sentence. Its interpretation gives the word "units" exactly the "dark or abstruse meaning" that Justice COOLEY warned against. Moreover, it seems to ignore the language pertaining to an "increase" in a required activity or service.

---

[5] Moreover, the second sentence of § 29 specifically requires the state to pay an individual unit of local government "for *any* necessary increased costs." (Emphasis added.) This is in direct contrast with the first sentence, which prohibits the state from reducing its *"proportion* of the necessary costs of any existing activity or service required of units of Local Government by state law." However, the majority requires that the state only pay for a proportion of the necessary cost of any increase in an expense resulting from a shift in responsibilities among different units of local government. While I agree with the majority's quotation of *Schmidt* explaining that the two sentences of § 29 " 'must be read together' " when interpreting the meaning of those two sentences, *ante* at 598, n 2, that does not mean that the two sentences should be read as requiring the same thing. The two sentences should be consistent with one another, but they still provide distinct requirements on the state and cover different situations. Any other interpretation would render the second sentence merely surplusage.

II. THE PURPOSE OF CONST 1963, ART 9, § 29

Not only do I find the majority's interpretation contrary to the language of § 29, I also find it contrary to the purposes underlying the Headlee Amendment. The Court has previously recognized that the Headlee Amendment was proposed as part of a nationwide "taxpayer revolt." *Durant v State Bd of Ed*, 424 Mich 364, 378; 381 NW2d 662 (1985). The amendment was intended to prohibit unfunded mandates so that the state could not require new or expanded activities of local units without fully funding them. *Id.* at 391. In order to effectuate this intent, § 29 was designed to prohibit the state from shifting the costs of activities or services required by state law to various units of local government:

> Having placed a limit on state spending, it was necessary to keep the state from creating loopholes either by shifting more programs to units of local government without the funds to carry them out, or by reducing the state's proportion of spending for "required" programs in effect at the time the Headlee Amendment was ratified. [*Livingston Co v Dep't of Management & Budget*, 430 Mich 635, 644; 425 NW2d 65 (1988).][6]

---

[6] The need for § 29's antishifting protections is underscored by § 31 of the Headlee Amendment, which specifically limits a local unit of government's ability to raise revenue for any new or expanded activities. In particular, § 31 does not allow a locality to raise property or other local taxes "without the approval of a majority of the qualified electors." See *Bolt v City of Lansing*, 459 Mich 152; 587 NW2d 264 (1998). Thus, Headlee's antishifting purpose, embodied in § 29, is critical to prevent the state government from requiring new or increased activities of a locality without giving the locality the means to pay for that new mandate. Otherwise, the local government would be forced into the Hobson's choice of trying to convince its constituency to approve by referendum a tax increase to pay for the unfunded state mandate, or to cut other areas of the locality's budget to pay for the mandate. Either choice is not likely to be popular with the voting public.

Unfortunately, however, the majority's analysis would allow the state to shift certain activities or services to local governments with no financial consequences. As long as some unit of local government undertook a particular activity or service in 1978, then the state would be able to require any or all other units of local government to undertake the task without providing any additional funding for this new mandate. For example, the state could require that every locality establish a separate "Recorder's Court" for criminal prosecutions. Although this separate recorder's court would be new to every locality except the city of Detroit, the majority's analysis would not require the state to fund any of these new courts, since a single recorder's court existed in the city of Detroit in 1978. Allowing the state to foist such an unfunded mandate on localities is, without question, diametrically opposed to the purpose behind Headlee.

Even so, the majority argues that it is reading § 29 in a way that is consistent with the purposes of Headlee. In particular, it argues that its interpretation meets the underlying purposes of "1) balancing state discretion in allocating funds and minimum funding guarantees for local units, and 2) uniform allocation of resources . . . ." *Ante* at 602. Assuming for sake of argument that these are the most significant purposes underlying § 29, I believe that the majority's approach gives wide latitude to the state to require localities to undertake services that they have never undertaken before.[7] As mentioned above, as long as

---

[7] It is worth noting that both these underlying principles come from *Schmidt*, which dealt with the first sentence of § 29. Since the first sentence requires that the state continue to fund its *proportionate* share of preexisting state mandates, it certainly makes sense that the Court was

some localities were undertaking the service in 1978, the state can require other localities to undertake the same function without providing funding for the new activity. More importantly, it allows the state to shift responsibilities between different units of local government so that resources are not distributed uniformly. For example, the state could shift a variety of activities formerly performed by several different units of local government to a single unit of local government, while only paying for a portion of the new cost to the locality. The single unit of government would have to shoulder the financial burden of all these new activities while the other units of local government would be alleviated of the financial burden accompanying the activity. In other words, some units of local government would receive a windfall at the expense of another.

For these reasons, I cannot accept the majority's reasoning. I believe that the state's obligations under the second sentence of § 29 flow to each individual unit of local government and not local governments in the collective. Therefore, I would hold that, if the state should mandate a program shift from one local unit to another, that program is "new" to the unit that must now provide the activity. The local unit is entitled to an appropriation for any necessary increased costs as a result of the switch. Similarly, if the state should mandate a program shift from one local unit to another that requires the unit to provide a greater level of an activity than the unit already provides, the

concerned about "minimum funding guarantees for local units" and "uniform allocation of resources." However, the second sentence requires funding for *all* new or increased activities. Thus, it is questionable whether these underlying purposes identified in *Schmidt* should apply to the second sentence of § 29 at all.

unit is likewise entitled to a state appropriation for any necessary increased costs resulting from the program shift.

Does this impose significant restrictions on state government? Does this, time and again, thwart the state's ability to enact good public policy? The obvious answer to each question is "yes." That, however, is the result, intended or unintended, of the Headlee Amendment that Michigan voters adopted.

### III. THE RELEVANT ACTIVITY OR SERVICE

Examining Act 374 from the standpoint of the individual units of local government involved in this case, I believe that the court reorganization mandated by the act does violate the Headlee Amendment. While I believe that the Court of Appeals properly viewed this case from the perspective of the individual units of local government rather than local governments in the collective, I believe it erred in defining the relevant activity or service in this case as "trial court operations." Rather, I believe the relevant activities or services in this case are "former Common Pleas Court functions" and "former Recorder's Court functions."[8]

---

[8] In 1978, the three trial courts located within Wayne County were organized differently than trial courts in other counties in the state of Michigan. In most Michigan counties there existed a district court and a circuit court. In Wayne County, there existed Recorder's Court, the Common Pleas Court, and the Third Circuit Court. Detroit Recorder's Court jurisdiction included felony, misdemeanor, and traffic and ordinance violations arising within the city of Detroit. Additionally, the civil functions normally performed by a district court were performed by the Common Pleas Court. Its jurisdiction included civil disputes less than $10,000 and landlord-tenant disputes. The Third Circuit Court's organization and jurisdiction was the same as other circuit courts statewide.

In 1980, the Legislature enacted 1980 PA 438 and 440, reorganizing the three Detroit/Wayne County trial courts. The acts created the 36th District Court and transferred to it the functions performed by the Common Pleas

The Court of Appeals holding is aptly summarized by the majority:

> The Court of Appeals concluded that "trial court operations" was the relevant activity or service under § 29. 228 Mich App [386] 401-402 [579 NW2d 378 (1998)]. It found that Act 374 requires counties to fund the operation of the circuit courts, district units to fund the operation of district courts, and the state to fully fund circuit and district court judicial salaries. *Id.* at 402-403. It found that in 1978, state law mandated that local units fund and operate circuit and district courts and that the state subsidized a portion of judicial salaries. *Id.* at 405. It then concluded that Act 374 neither mandated new activities for local units nor increased the level of any activity required of local units. *Id.* Finally, it concluded that, despite incomplete information to perform the relevant equations, it was able to determine that Act 374 did not decrease the state-financed proportion of necessary costs of trial court operations to either Detroit or Wayne County from that provided on a statewide basis in 1978. *Id.* at 407-408. [*Ante* at 596-597.]

However, defining the relevant activity or service in question as "trial court operations" is simply too broad a category. First, the circumstances surrounding the adoption of the Headlee Amendment clearly indicate that the people of Michigan intended the word "activity" to apply to more specific functions than the umbrella term "trial court operations." A primary aim of those who ratified the Headlee Amendment was to prevent the state from enacting laws and

Court along with the criminal misdemeanor and traffic and ordinance divisions of Recorder's Court. The Common Pleas Court was abolished. However, Recorder's Court continued to have felony criminal jurisdiction.

It is worth noting that the Legislature conditioned the 1980 court reform legislation on the city of Detroit and Wayne County agreeing to assume responsibility for the expenses required of them by the court reform legislation. As a result of negotiations between the local units and the state, both the city and the county expressly waived any potential claims under the Headlee Amendment.

regulations that create financial burdens on local units, unaccompanied by financial support to alleviate those burdens. *Schmidt*, 441 Mich 251. If all trial court functions fall under the broad category of "trial court operations," the state is free to impose a multitude of laws and regulations on a local unit without an appropriation for the resulting increased costs. To accept the Court of Appeals definition would create a situation in which a local unit can be depicted as having provided practically any activity in 1978, thereby precluding a finding that a "new" activity had been imposed.[9] This construction effectively nullifies the second sentence of the amendment. The people, in adopting the Headlee Amendment, did not intend to offer so little protection against the very problem that they aimed to prevent.[10]

---

[9] For example, as plaintiffs argue, local units also have the obligation to provide education, prosecuting attorneys, police officers, fire protection, etc. Every new local mandate will, by definition, fall under one of these categories since these are only the broadly defined categories under which local units of government are vested with the power to act. To define the relevant activity in such a broad manner means that every new mandate would be determined for Headlee purposes to be merely a continuation of broader, preexisting activities.

[10] Further support is found in the definitions contained in the Headlee implementation statute:

"Activity" means a specific and identifiable administrative action of a local unit of government. The provision of a benefit for, or the protection of, public employees of a local unit of government is not an administrative action. [MCL 21.232(1); MSA 5.3194(602)(1).]

"Service" means a specific and identifiable program of a local unit of government which is available to the general public or is provided for the citizens of the local unit of government. The provision of a benefit for, or the protection of, public employees of a local unit of government is not a program. [MCL 21.234(1); MSA 5.3194(604)(1).]

These definitions reinforce the idea that the Court of Appeals characterization of the relevant activity as "trial court operations" is too broad. Trial court functions as a whole have historically been broken down to specific

Moreover, this Court's decision in *Durant* reflects that the proffered definition is too broad. In *Durant*, one issue presented to the Court was whether education, as a whole, is a state-mandated "activity" within the meaning of the Headlee Amendment. Plaintiffs attempted to characterize the relevant activity as "education." They argued that because the state has delegated to local school districts the duty to provide education, all the functions performed by a school district are required by state law within the meaning of the Headlee Amendment. The Court rejected this reasoning and held that § 29 applies only to *specific* requirements imposed on the school districts by state statutes and state agencies.[11]

By analogy, just as "education" is too broad a concept for a Headlee examination, so too is the broad concept of "trial court operations." The Court of Appeals reviewed the statutory delineations of various educational functions in order to determine if the activities were specific and identifiable. We should similarly examine the statutory delineations of trial court functions. For example, the Common Pleas Court (the predecessor of the 36th District Court)

---

areas of jurisdictional authority. Thus, to characterize the activity or service that a local unit provides as "trial court services" would do little to shed light on what the unit "specific[ally] and identifiabl[y]" provides.

[11] *Durant v State Bd of Ed*, 424 Mich 375. This portion of the decision affirmed the decision of the Court of Appeals on remand, which stated:

Only those specific and identifiable programs which the state requires the school districts to provide by state statute or state agency regulation fall within the state financing requirements of § 29. [129 Mich App 517, 528; 342 NW2d 591 (1983).]

Examples of such state-mandated programs as stated in *Durant* are: courses in the constitution, history, government, and civics, courses in health and physical education, bilingual instruction in school districts with an enrollment of twenty or more children of limited English speaking ability, special education, etc.

was a distinct judicial entity, established and operated pursuant to 1929 PA 260 and vested with specific judicial authority different from any other court in Wayne County. The same can be said of Recorder's Court. Thus, it is logical to define the relevant activity by the statutory parameters set for its delivery. To define the activities as "former Common Pleas Court functions" and "former Recorder's Court functions" comports with the purpose and intent of the Headlee Amendment as well as the applicable case law.

Thus, I would hold that the relevant activities or services in this case are "former Common Pleas Court functions" and "former Recorder's Court functions." Such a holding would provide the level of specificity required by the Headlee Amendment. Viewing the relevant activities or services as such, I would find that Act 374 violates § 29 of the Headlee Amendment by requiring the city of Detroit to undertake the new or increased responsibility for "former Common Pleas Court functions," and Wayne County for undertaking the new or increased responsibility for "former Recorder's Court functions."

### IV. CONCLUSION

The majority finds no Headlee violation in this case by examining units of local government in the collective for purposes of determining whether the state has required them to undertake "new" or "increased" activities. However, I believe such an approach is simply inconsistent with the language and purpose of Const 1963, art 9, § 29. Act 374 requires that the city of Detroit provide "former Common Pleas functions" and that Wayne County provide "former Recorder's Court functions." These activities were previously

performed by other units of local government. Nevertheless, I believe that the state's funding obligation under the Headlee Amendment is implicated because the activities are "new" to these particular units of local government. Consequently, the state should be required to make appropriations for any necessary increased costs resulting from the requirements of Act 374.

BRICKLEY and KELLY, JJ., concurred with CAVANAGH, J.