**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

FILED JUNE 9, 2004

DANIEL ADAIR, a taxpayer of
the Fitzgerald Public
Schools, and FITZGERALD
PUBLIC SCHOOLS, et al.,

    Plaintiffs-Appellants,

v

           No. 121536

STATE OF MICHIGAN, DEPARTMENT
OF EDUCATION, DEPARTMENT OF
MANAGEMENT AND BUDGET, and
TREASURER OF THE STATE OF
MICHIGAN,

    Defendants-Appellees.

_____

BEFORE THE ENTIRE BENCH

TAYLOR, J.

This Court is once again called on to decide if the state has met its constitutional mandate to adequately fund public education. Plaintiffs are taxpayers and school districts seeking a declaratory judgment that the state failed to meet its funding responsibility mandated by Const 1963, art 9, § 29, a section of our Constitution that is commonly known as the "Headlee Amendment." The complaint

asserts that the state did not provide funding to school districts in Michigan for the necessary increased costs of providing activities and services that are new or mandated at an increased level since December 23, 1978. The Court of Appeals found that claims plaintiffs did raise or could have raised in earlier suits were barred pursuant to the doctrine of res judicata.[1] As to those issues that were not subject to res judicata analysis, the Court of Appeals held that they were otherwise barred because of releases the parties executed or the activities[2] were not new or were not increased activities within the meaning of Const 1963, art 9, § 29. We affirm in part, reverse in part, and remand.

## I. CONSTITUTIONAL PROVISIONS

Under Michigan's Headlee Amendment,[3] as of 1978, the state is forbidden from reducing funding levels for the necessary costs of existing activities or services mandated by the Legislature, and is to completely fund the necessary costs of new or increased activities or services mandated by the Legislature:

---

[1] *Adair v Michigan*, 250 Mich App 691; 651 NW2d 393 (2002).

[2] Throughout this opinion, for brevity's sake, "activities and services" are frequently referred to as simply "activities."

[3] Const 1963, art 9, §§ 25-34.

The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law. A new activity or service or an increase in the [level] of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs. The provision of this section shall not apply to costs incurred pursuant to Article VI, Section 18. [Const 1963, art 9, § 29.]

These two different provisions in art 9, § 29 have been described by this Court as follows:

The first sentence of this provision prohibits reduction of the state proportion of necessary costs with respect to the continuation of state-mandated activities or services. The second sentence requires the state to fund any additional necessary costs of newly mandated activities or services and increases in the level of such activities or services from the 1978 base year. [*Judicial Attorneys Ass'n v Michigan*, 460 Mich 590, 595; 597 NW2d 113 (1999), quoting 228 Mich App 386, 396; 597 NW2d 378 (1998).]

To assist the public in understanding the different thrusts of these two sentences, this Court has described the first sentence as a "maintenance of support" (MOS) provision and the second sentence as a "prohibition on unfunded mandates" (POUM) provision. See *id.* Accordingly, to establish a Headlee violation under the MOS clause, the plaintiffs must show "(1) that there is a continuing state mandate, (2) that the state actually funded the mandated activity at a certain proportion of necessary costs in the

3

base year of 1978-1979, and (3) that the state funding of necessary costs has dipped below that proportion in a succeeding year." *Oakland Co v Michigan*, 456 Mich 144, 151; 566 NW2d 616 (1997)(opinion by Kelly, J.). Under the POUM clause, they must show that the state-mandated local activity was originated without sufficient state funding after the Headlee Amendment was adopted or, if properly funded initially, that the mandated local role was increased by the state without state funding for the necessary increased costs.

However, not all activity changes established pursuant to statute or rule constitute "new or increased" activity requiring state funding. MCL 21.234(5) explains what the POUM provision excludes:

> (a) A requirement imposed on a local unit of government by a state statute or an amendment to the state constitution of 1963 adopted pursuant to an initiative petition, or by a state law or rule enacted or promulgated to implement such a statute or constitutional amendment.

> (b) A requirement imposed on a local unit of government by a state statute or an amendment to the state constitution of 1963, enacted or adopted pursuant to a proposal placed on the ballot by the legislature, and approved by the voters, or by a state law or rule enacted or promulgated to implement such a statute or constitutional amendment.

> (c) A court requirement.

> (d) A due process requirement.

> (e) A federal requirement.

4

(f) An implied federal requirement.

(g) A requirement of a state law which applies to a larger class of persons or corporations and does not apply principally or exclusively to a local unit or units of government.

(h) A requirement of a state law which does not require a local unit of government to perform an activity or service but allows a local unit of government to do so as an option, and by opting to perform such an activity or service, the local unit of government shall comply with certain minimum standards, requirements, or guidelines.

(i) A requirement of a state law which changes the level of requirements, standards, or guidelines of an activity or service that is not required of a local unit of government by existing law or state law, but that is provided at the option of the local unit of government.

(j) A requirement of a state law enacted pursuant to section 18 of article 6 of the state constitution of 1963.

Thus, under a POUM analysis, not every required change in school activities requires state funding under the Headlee Amendment. *Judicial Attorneys Ass'n, supra* at 603. Headlee, at its core, is intended to prevent attempts by the Legislature "to shift responsibility for services to the local government . . . in order to save the money it would have had to use to provide the services itself." *Id.* at 602-603.

Taxpayers alleging a violation of the Headlee Amendment may file a request for declaratory relief in the

Court of Appeals under Const 1963, art 9, § 32.[4] In this case, plaintiffs have brought suit under art 9, § 32, alleging that the Legislature violated the second provision of art 9, § 29 by requiring new activities and increases in existing activities without providing sufficient additional funding. Because of the extensive history of similar litigation between these parties, a brief review of the earlier suits is required.

## II. HISTORY

Many of these plaintiffs have brought allegations of underfunding against these defendants in earlier suits. In 1980, the first of these suits was filed; it was not resolved until seventeen years later. *Durant v Michigan*, 456 Mich 175; 566 NW2d 272 (1997) (*Durant I*). Chiefly at issue in *Durant I* was a reduction in state funding for special education activities. Ultimately, this Court not only granted declaratory relief for the plaintiffs, but also, in an award that deeply divided the Court on the issue of the Court's authority, awarded money damages. In

---

[4] The remedy provision reads:
> Any taxpayer of the state shall have standing to bring suit in the Michigan State Court of Appeals to enforce the provisions of Sections 25 through 31, inclusive, of this Article and, if the suit is sustained, shall receive from the applicable unit of government his costs incurred in maintaining such suit.

this case, there is no claim for damages and we need not revisit the issue of the propriety of a damages award, but would note that even the proponents of money damages in *Durant I* described it as "atypical" and predicated the claim for the award on the prolonged duration of *Durant I*. Subsequently, the Legislature, perhaps taken aback by the monetary damages award, undertook to work statewide equity by making available similar relief to those local and intermediate school districts that were not plaintiffs in *Durant I*. As the legislation described it, it was to be in "settlement and compromise of any claim or claims that were or could have been asserted by these districts and intermediate districts" in the *Durant I* litigation. MCL 388.1611f(1), (2), (4). To receive the settlement funds, however, a school district had to provide the State Treasurer with a board resolution

> waiving any right or interest the district or intermediate district has or may have in any claim or litigation based on or arising out of any claim or potential claim through September 3, 1997 that is or was similar to the claims asserted by the plaintiffs in the consolidated cases known as *Durant v State of Michigan*. [MCL 388.1611f(1). Similarly, see MCL 388.1611f(2).]

Three hundred eighty-two of the local and intermediate school districts named as plaintiffs in the instant suit adopted the statutorily prescribed resolution, timely sent

the executed resolutions to the State Treasurer, and received settlement payments.[5]

Several months later, in 1998, plaintiffs taxpayers and school districts brought a second suit, alleging that the system the state used for distributing funds resulted in an underfunding of the schools for the years 1997-1998 through 2000-2001 in violation of the Headlee Amendment. *Durant v Michigan (On Remand)*, 238 Mich App 185; 605 NW2d 66 (1999) (*Durant II*). The Court of Appeals granted declaratory relief largely in the plaintiffs' favor. This Court denied leave on the substantive issues of the case. 462 Mich 882 (2000).

A year later, similar plaintiffs returned to file two suits. In the first, *Durant v Michigan*, 251 Mich App 297; 650 NW2d 380 (2002) (*Durant III*), the plaintiffs alleged that 2000 PA 297, which had been enacted in response to *Durant II* to cure the deficiencies the Court had found in the State School Aid Act, MCL 388.1601 *et seq.*, was constitutional. However, the Court of Appeals found this system was constitutional, and this Court denied leave. 467 Mich 900 (2002). The second lawsuit, which is the subject of this appeal, was similar to *Durant I* except,

---

[5] For further discussion of the settlement and resolution, see the Court of Appeals opinion in this case, *Adair,* 250 Mich App 691.

8

unlike *Durant I*, which focused on the first sentence of art 9, § 29, the MOS clause, this action focused on the second sentence, the POUM clause. Thus, plaintiffs claim that the state did not provide sufficient funding for activities that were new or were mandated to be provided at increased levels, causing a Headlee-prohibited unfunded mandate.

Specifically, plaintiffs alleged in count I that, through seven administrative rules,[6] the state mandated that the school districts provide a variety of new special education activities and services[7] and then failed to fund those activities. In count II, they alleged that, pursuant to MCL 380.1284, school districts were required to increase annually the hours of pupil instruction without increased state funding.[8] Count III alleged that, through twelve

---

[6] These are: 1999 AC, R 340.1721e, R 340.1738, R 340.1740, R 340.1744, R 340.1745, R 340.1750, and R 340.1758.

[7] These include provisions for transitional services, a lower student-teacher ratio in four different situations, a classroom aide, adaptive devices, a director of special education, and autistic services.

[8] In 1978, local school districts were required to provide a minimum of 900 hours of pupil instruction a year; the statute increased this incrementally, requiring 1134 hours by 2006-2007.

statutes[9] and Executive Order No. 2000-9, the state mandated local districts to provide activities and services not required in 1978,[10] again without providing funding.

---

[9] MCL 380.622, 380.1169, 380.1272a, 380.1277, 380.1278, 380.1279, 380.1280, 380.1282, 380.1282a, 380.1527, 388.1752, and 257.1851.

[10] The Court of Appeals opinion succinctly described these as

(1) an annual financial records audit by a certified public accountant for intermediate school districts; (2) the instruction of students regarding dangerous communicable diseases; (3) specialized training for teachers regarding human immunodeficiency virus infection and acquired immunodeficiency syndrome; (4) the provision of a breakfast program; (5) the annual development and implementation of a three- to five-year school improvement plan [the "school improvement plan" obligation]; (6) the development of a continuing school improvement process; (7) the provision of a core academic curriculum; (8) the administration of state assessment tests to high school pupils; (9) the provision of remedial educational services and periodic retesting for pupils who fail the required assessment tests; (10) the accreditation of school buildings; (11) the provision of "learning processes" and special and sufficient assistance to each pupil in order to enable each pupil to achieve a state-endorsed diploma [the "special assistance" obligation]; (12) the provision of summer school classes for pupils who fail to meet standards for basic literacy skills or basic mathematics skills by the end of the third grade year; (13) the provision of a minimum of four days of "teacher professional development" in the 2000-01 school year and a minimum of five days in the 2001-02 school year and each subsequent school year; (14) the creation and maintenance of data on "essential student data elements" and the transmission of this data through the Internet in a standardized form to the Department of

(continued…)

10

Defendants moved for summary disposition of all counts pursuant to MCR 2.116(C)(7) (claim barred as a matter of law) and C(8) (failure to state a claim on which relief can be granted), as well as summary disposition of count I pursuant to C(10) (no genuine issue of material fact).

Defendants argued chiefly that, under C(7), plaintiffs were barred by the doctrine of res judicata because of the *Durant I* litigation and by release and waiver because of the statutorily required release they had executed pursuant to the Legislature's post-*Durant I* enactment, MCL 388.1611f. Defendants further argued that the claims failed either as a matter of law under C(8) or as a matter of fact under C(10) because plaintiffs did not sufficiently allege the type or the extent of the necessary increased costs of new activities. See *Oakland Co*, 456 Mich 166.

Plaintiffs responded that res judicata did not apply because *Durant I* resolved only issues relating to the first sentence of art 9, § 29, whereas this action concerns the second sentence. Furthermore, they asserted that res judicata was inapplicable because the relief they sought

(continued…)
    Education . . . [the "record-keeping" obligation]; and (15) the provision of compensation to school bus drivers for time spent attending various training and tests. [250 Mich App 699-701.]

11

was prospective and covered a different period than that covered by *Durant I*. With regard to those plaintiffs who signed the statutory release, they claimed they should not have lesser rights than the actual litigants and that furthermore the release permits claims arising after the release date. Regarding the C(10) factual issues, plaintiffs asserted that their proofs would show sufficient factual support for their claims.

The Court of Appeals majority ruled for defendants on all counts. 250 Mich App 715. It found that, under MCR 2.116(C)(7), all the plaintiffs who were also plaintiffs in *Durant I* were barred by res judicata because the present claims, except for one activity alleged in count III, could have been raised in the earlier suit. 250 Mich App 706. Reinforcing this point, the Court found that because some plaintiffs had raised POUM claims, all plaintiffs were barred because those raising POUM issues effectively represented the interests of the others. The majority also found that the districts that had signed releases were similarly barred under C(7) because the release expressly applied to "any claim or potential claim . . . similar to the claims asserted by the plaintiffs in [*Durant I*]," and the alleged underfunding predated the releases. 250 Mich App 708, 710. Thus, the majority reasoned, these plaintiffs had no more rights than the parties who had

actually litigated *Durant I*, and all claims, with the one exception discussed below, were disposed of pursuant to MCR 2.116(C)(7).

The remaining claim, that the record-keeping requirements found in MCL 388.1752 and EO 2000-9 imposed a new or increased mandate, was found by the Court of Appeals not to violate the Headlee Amendment. The majority concluded that these requirements predated *Durant I* and thus could have been raised in *Durant I*. In considering MCL 388.1752, it pointed out that the obligations imposed by the statute already existed in 1978. Further, any later amendments of the statute simply renumbered it[11] and defined the scope of the obligation.[12] 250 Mich App 712. Accordingly, it was the Court's view that the amendment did not violate Headlee because "[c]larifying nonsubstantive changes in an earlier, existing state law does not constitute a new activity or service or increase in the level of an existing activity or service. MCL 21.233(7)." *Id*. With regard to EO 2000-9 and its standards for uniform reporting of information, the majority found that they were merely designed to streamline a process that had existed before Headlee and thus did not mandate new activity. 250

---

[11] 1979 PA 94, § 512.

[12] 1989 PA 197, § 152.

Mich App 713-714, citing *Judicial Attorneys Ass'n, supra* at 605. Therefore, with regard to these record-keeping requirement issues, the Court granted defendants' motion for summary disposition pursuant to MCR 2.116(C)(10).

Reinforcing this last holding, the Court of Appeals noted that the record-keeping activities were administrative functions that "constitute the essence of the state's constitutional obligation to 'maintain and support a system of free public education and secondary schools . . . .' Const 1963, art 8, § 2," and accordingly fell outside the restrictions of the Headlee Amendment. 250 Mich App 714.

Plaintiffs sought leave to appeal to this Court, raising the same arguments they brought in the Court of Appeals to challenge defendants' motion for summary disposition. We granted leave. 467 Mich 919 (2002).

### III. STANDARD OF REVIEW

The question whether res judicata bars a subsequent action is reviewed de novo by this Court. *Pierson Sand & Gravel, Inc v Keller Brass Co*, 460 Mich 372, 379; 596 NW2d 153 (1999). Whether the Court of Appeals properly determined that release barred those plaintiffs pursuant to MCR 2.116(C)(7) is likewise reviewed de novo. *Maskery v Univ of Michigan Bd of Regents*, 468 Mich 609, 613; 664 NW2d 165 (2003).

14

We also review de novo the Court's decision to grant or deny summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). "A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint. All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant." *Maiden, supra* at 119. The motion "may be granted only where the claims alleged are 'so clearly unenforceable as a matter of law that no factual development could possibly justify recovery.'" *Id*. (citation omitted). We discussed this pleading requirement as it pertains to Headlee claims in *Oakland Co, supra* at 166 (opinion by Kelly, J.):

> Under *Durant* [*I*], future plaintiffs must allege the type and extent of the harm so that the court may determine if a § 29 violation occurred for purposes of making a declaratory judgment. In that way, the state will be aware of the financial adjustment necessary to allow for future compliance.[13]

In a C(10) motion, testing the factual sufficiency of the complaint, we consider "the substantively admissible evidence actually proffered in opposition to the motion." *Maiden, supra* at 121. Thus, when such a motion is properly brought, the nonmovant must, under MCR 2.116(G)(3)(b) and

---

[13] Although *Oakland Co* dealt with MOS claims, as we noted in *Judicial Attorneys Ass'n, supra* at 598 n 2, that does not make it "inapplicable to an analysis of the second sentence of § 29." Thus, the requirements of POUM claims are, in this respect, similar to MOS claims.

2.116(G)(4), produce admissible support for its opposition in order to defeat the motion.

## IV. ANALYSIS

## A. Res judicata

In discussing res judicata in the context of a Headlee claim, it is important to begin by asking how the constitutional ratifiers of Headlee, the citizens of Michigan, would have envisioned the handling of repeated relitigation of the same issue. We ask this because it is their understanding that must control. As we have observed many times:

> A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. "For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed." [*American Axle & Mfg, Inc, v Hamtramck*, 461 Mich 352, 363; 604 NW2d 330 (2000), quoting 1 Cooley, Constitutional Limitations (8th ed), p 143.]

We consider it apparent that the people would have thought, as with all litigation, there would be the traditional rules that would preclude relitigation of similar issues by similar parties: that is, the area of law we describe formally as encompassed by the doctrine of res

16

judicata. We must then consider res judicata and apply it to this unique Headlee situation.

The doctrine of res judicata is employed to prevent multiple suits litigating the same cause of action. The doctrine bars a second, subsequent action when (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first. *Sewell v Clean Cut Mgmt, Inc*, 463 Mich 569, 575; 621 NW2d 222 (2001). This Court has taken a broad approach to the doctrine of res judicata, holding that it bars not only claims already litigated, but also every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not. *Dart v Dart*, 460 Mich 573, 586; 597 NW2d 82 (1999).

Examining the *Sewell* factors, we note that it is uncontested that *Durant I* was decided on its merits. In *Durant I* we resolved the question of the state's ability under Headlee to reduce funding, in the circumstances there presented, for existing programs.

With respect to the second res judicata requirement, that the parties in the later suit be the same or be those in privity with them, plaintiffs acknowledge that there is some overlap among the school districts, but assert it is not complete and the individual taxpayers are also not

17

identical. This defense implicates the scope of the concept of "privity."

To be in privity is to be so identified in interest with another party that the first litigant represents the same legal right that the later litigant is trying to assert. *Baraga Co v State Tax Comm*, 466 Mich 264, 269-270; 645 NW2d 13 (2002). The outer limit of the doctrine traditionally requires both a "substantial identity of interests" and a "working functional relationship" in which the interests of the nonparty are presented and protected by the party in the litigation. *Id.*, quoting *Baraga Co v State Tax Comm*, 243 Mich App 452, 456; 622 NW2d 109 (2000), citing *Phinisee v Rogers*, 229 Mich App 547, 553-554; 582 NW2d 852 (1998). In litigation concerning the MOS or POUM provisions of the Headlee Amendment, Const 1963, art 9, § 29, where a taxpayer or a local unit of government is suing the state, the issue is whether the Legislature's act is unconstitutional as it applies not just to a single local unit of government, but to all local units affected by the legislation. In such cases, the interests of all similar local units of government and taxpayers will almost always be identical. If the relief sought by one plaintiff to remedy a challenged action is indistinguishable from that sought by another, such as when declaratory relief is sought concerning an act of the Legislature establishing

18

the proportion of state funding for local government units, the interests are identical.

Thus, for the purposes of the second *Sewell* factor, a perfect identity of the parties is not required, only a "substantial identity of interests" that are adequately presented and protected by the first litigant. We find that the interests of the current plaintiffs were, for Headlee purposes, adequately represented by the plaintiffs in *Durant I*. The taxpayer parties all have the same interest: that mandated activities are funded as they are required to be under the Headlee Amendment. These interests were presented and protected by the extensive and thorough litigation that occurred in *Durant I*.[14] Thus, we find the current taxpayer plaintiffs are in privity with the *Durant I* plaintiffs.[15]

---

[14] We find Justice Kelly's implication (*post* at 4 n 2) that any taxpayer moving to the state after 1997 could relitigate any *Durant I* claim unreasonable not merely because it would be burdensome to the parties and the courts but also because it would preclude ever having a final answer upon which state and local governments could confidently act. It is indeed such concerns that have animated the judicial utilization of the doctrine of res judicata. As we said in *In re MCI*, 460 Mich 396, 431 n 7; 596 NW2d 164 (1999), "The doctrine of res judicata was judicially created in order to 'relieve parties of the cost and vexation of multiple lawsuits . . . .'"

[15] This is not to say, as Justice Weaver suggests (*post* at 6), that these plaintiffs lack *standing*. Any taxpayer may bring a claim—that is, any taxpayer has standing. If

(continued…)

19

We find the school districts, again for Headlee purposes, also have the same legal interest protected by the *Durant I* plaintiffs and are similarly in privity. In this case, particularly because only declaratory relief, not damages, was sought, it is evident that all school districts have the same interest.

Finally, concerning the last element of res judicata, we must decide whether the matter in the second case was or could have been resolved in the first. Res judicata bars every claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not. *Sewell, supra* at 575-576. This Court has noted that "[r]es judicata bars a subsequent action between the same parties when the evidence or essential facts are identical." *Dart, supra* at 586. This statement refers to what is generally called the "same evidence" test. Because there appears to be some confusion regarding the relationship between the "same transaction" test and the "same evidence" test, we take this opportunity to provide clarification.

The "same transaction" test and the "same evidence" test are alternative approaches used in determining the

---

(continued…)
the claim concerns an issue that has already been the subject of litigation, it is subject to the doctrine of res judicata.

20

applicability of res judicata.  As stated by the Illinois
Supreme Court in *River Park, Inc v Highland Park,* 184 Ill
2d 290, 307-309, 703 NE2d 883 (1998) (citations omitted):

> Under the "same evidence" test, a second
> suit is barred "if the evidence needed to sustain
> the second suit would have sustained the first,
> or if the same facts were essential to maintain
> both actions." The "transactional" test provides
> that "the assertion of different kinds or
> theories of relief still constitutes a single
> cause of action if a single group of operative
> facts give rise to the assertion of relief."
>
> * * *
>
> [U]nder the same evidence test the
> definition of what constitutes a cause of action
> is narrower than under the transactional test.
> As explained in the Restatement (Second) of
> Judgments, the same evidence test is tied to the
> theories of relief asserted by a plaintiff, the
> result of which is that two claims may be part of
> the same transaction, yet be considered separate
> causes of action because the evidence needed to
> support the theories on which they are based
> differs. By contrast, the transactional approach
> is more pragmatic. Under this approach, a claim
> is viewed in "factual terms" and considered
> "coterminous with the transaction, regardless of
> the number of substantive theories, or variant
> forms of relief flowing from those theories, that
> may be available to the plaintiff; * * * and
> regardless of the variations in the evidence
> needed to support the theories or rights."

Because this Court has accepted the validity of the
broader transactional test in Michigan, we need not
consider as dispositive plaintiffs' assertions that the
evidence needed to prove this case is different than was
needed in *Durant I.*  Although that fact may have some
relevance, the determinative question is whether the claims

21

in the instant case arose as part of the same transaction as did the claims in *Durant I*. "Whether a factual grouping constitutes a 'transaction' for purposes of res judicata is to be determined pragmatically, by considering whether the facts are related in *time, space, origin or motivation*, [and] whether they form a convenient trial unit . . . ." 46 Am Jur 2d, Judgments § 533, p 801 (emphasis added).

With the limited exception of several count III claims discussed below, the statutory and regulatory requirements complained of in this case, and alleged to be "new" or "increased" activities since Headlee was enacted, existed during the pendency of *Durant I*. Moreover, the requirements, like those in *Durant I*, have been imposed by the Legislature and executive bodies on local school districts for the purpose of providing public education. Thus, they are related to one another in "time, space [and] origin." Further, because the allegations in both this case and *Durant I* concern the Headlee Amendment, the claims are related by "motivation" as well. As pleaded, we find no indication that plaintiffs, with due diligence, could not have asserted these claims during the pendency of

*Durant I.* Indeed, some of the claims in this case were actually claimed in *Durant I.*[16]

Therefore, with the several count III exceptions discussed below, we agree with the Court of Appeals that plaintiffs' claims in this case arose from the same transactions as did the *Durant I* claims and that plaintiffs, exercising due diligence, could have filed them during the pendency of *Durant I.*[17] Thus, plaintiffs' claims are barred by res judicata.

Moreover, we note that, were this Court to adopt the approach of Justice Kelly's dissent, which essentially removes Headlee declaratory judgment actions from the general rules of res judicata, we would be subjecting the state to litigate and relitigate a potentially endless barrage of repetitive claims with only the plaintiffs

---

[16] Although plaintiffs' brief to this Court asserts that their complaint specifically claimed that the state failed to meet its funding obligation "by operation of the 2000 amendment to the Act, 2000 PA 297," no such claim or enactment was alleged in the complaint. Contrary to Justice Cavanagh's assertion, we do not create here a "new requirement" for pleading. *Post* at 5. We simply note that, as pleaded (including plaintiffs' response to defendant's motions to dismiss), plaintiffs' claims were indistinguishable from those of *Durant I.*

[17] Plaintiffs offer no evidence that, during the pendency of *Durant I*, they made any effort to add these claims under MCR 2.118(E). We thus find no basis for their assertion that they could not have litigated the claims in the earlier suit.

23

changing.[18]  Justice Kelly would address this problem using stare decisis rather than res judicata.  While she does not explain how this would work,[19] we deduce that she prefers an outcome where only those issues actually litigated would be barred, because stare decisis would not apply to claims that could have been brought in the first suit, but were not.  See *Brown v Manistee Co Rd Comm*, 452 Mich 354, 365-366; 550 NW2d 215 (1996).  Her approach using stare decisis would allow each individual taxpayer in the state a chance to bring a separate suit alleging similar, but not identical, claims.  It is, in short, an invitation to a total paralysis of government, both state and local, as it would deprive state and local officials, as well as citizens, of the ability to know with finality what the law is.  Such an approach would surely bring the Headlee protections into disrepute and thus jeopardize them.  We

---

[18] For example, under the approach of Justice Kelly's dissent, an individual taxpayer from the Saginaw School District could file a particular claim on Monday that is resolved, then a taxpayer from the Bay City School District could file an identical claim on Tuesday that is resolved, and a taxpayer from the Midland School District could file an identical claim on Wednesday that is resolved, and so on.

[19] Indeed, stare decisis apparently would *not* work here, as can be seen by Justice Kelly's conclusion that all the claims of the non-*Durant I* individual litigants would be allowed by that doctrine, where we would find them barred by res judicata.

decline to convert Headlee into such a Frankensteinian monster because we see nothing in the Headlee Amendment that suggests to us that the people, in passing the Amendment, also planned to effectively sabotage it by disregarding well-established rules of res judicata that could make it workable.

### B. Release and waiver

In enacting MCL 388.1611f, the Legislature created a contract and a release with the local units of government. The release states that the school district

> waives any right or interest it may have in any claim or potential claim through September 30, 1997 relating to the amount of funding the district or intermediate district is, or may have been, entitled to receive under the state school aid act of 1979, 1979 PA 94, MCL 388.1601 to 388.1772, or any other source of state funding, by reason of the application of section 29 of article IX of the state constitution of 1963, which claims or potential claims are or were similar to the claims asserted by the plaintiffs in the consolidated cases known as [*Durant I*]. [MCL 388.1611f(8).]

The scope of a release is controlled by the language of the release, and where, as here, the language is unambiguous, we construe it as written. *Batshon v Mar-Que Gen Contractors, Inc*, 463 Mich 646, 650; 624 NW2d 903 (2001).

After *Durant I* was finally resolved, the Legislature wanted to produce an outcome relating to the nonlitigating districts equivalent to those that litigated. Thus, funds

25

were appropriated, conditioned on the recipient executing a release, which would place the recipient in a position comparable to that of the *Durant I* litigants. Accordingly, the recipients, having executed the release, are also barred from raising not only claims actually asserted in *Durant I,* but also all claims or potential claims through September 30, 1997, that are similar to those that were asserted. That being the case, we agree with the Court of Appeals that, pursuant to MCR 2.116(C)(7), those districts agreeing to the release are barred from raising the claims of counts I and II, and all but three claims of count III, because those claims existed before September 30, 1997, and they are similar to the claims asserted in *Durant I.*

### C. Claims arising after 1997

Of all plaintiffs' claims concerning the seven administrative rules, thirteen statutes, and one executive order, only a few involve post-*Durant I* mandates. Of the seven administrative rules identified in count I, six were promulgated in 1987 and one in 1983. Thus, none postdates *Durant I,* and the analysis in the res judicata and release sections of this opinion applies to bar these claims. Regarding count II, it concerns MCL 380.1284, for which the last amendment making substantive changes to mandated activities was 1995 PA 289. Thus, it similarly is barred. With regard to count III, one claim was withdrawn and one

26

of the identified statutes was repealed.[20] Of the remaining ten statutes,[21] only two, MCL 380.1277 and 380.1282, include changes regarding activities added after *Durant I*. The executive order also postdates *Durant I*, having been issued in 2000.

This leaves, then, these three claims that arguably are based on post-*Durant I* mandates. The first we turn to is the record-keeping activity claimed by plaintiffs to result from the interaction of MCL 388.1752 and EO 2000-9. We determine that the Court of Appeals erred in concluding that the statute and the order do not mandate new activities within the meaning of the Headlee Amendment. At the time the Headlee Amendment became effective, the statute required the school districts to "furnish to the department [of education] those reports as the department considers necessary for the determination of the allotment of funds under this act."[22] 1977 PA 90, § 152. This provision was further amended by 1989 PA 197, § 152, which

---

[20] The claim concerning MCL 380.622 was withdrawn, and MCL 380.1282a was repealed.

[21] These are: MCL 380.1169, 380.1272a, 380.1277, 380.1278, 380.1279, 380.1280, 380.1282, 380.1527, 388.1752, and 257.1851.

[22] As noted above, this provision was, in 1978, codified at MCL 388.1552, and renumbered by 1979 PA 94, § 152, and amended by 1989 PA 197, § 152.

required schools to provide information "necessary for the administration of this act and for the provision of reports of educational progress . . . ." Thus, during the pendency of *Durant I*, plaintiffs were already under a broad obligation to report to the state whatever information it required pursuant to its statutory duties. The Headlee Amendment is not necessarily implicated when the state increases or changes what information it requires because the schools' obligation to provide that information has existed since before the time Headlee was effective. See *Judicial Attorneys Ass'n*, 460 Mich 599-600.

However, the executive order, which established the Center for Educational Performance and Information, empowered the Center to incorporate or implement two statewide databases: the Michigan Education Information System and the Database for Educational Performance and Information. Plaintiffs alleged that this requires school districts to create and maintain student data on an ongoing basis following state-specified data-gathering procedures and to transmit those data over the Internet to the state. The allegation here is that the state is not merely requiring different data from the school districts, but also requiring the districts to actively participate in maintaining data that the state requires for its own purposes. An off-loading of state funding responsibilities

onto local units of government without the provision of funds presents a colorable claim under Headlee. See *Judicial Attorneys Ass'n, supra* at 603. In short, plaintiffs here alleged new requirements that were not funded at all. Accepting plaintiffs' allegations as true, we find, at this stage in the proceedings, they have sufficiently stated a claim on which relief can be granted and thus this POUM claim survives defendants' C(8) motion. *Oakland Co, supra,* at 166.[23] Furthermore, we note that, while the Court of Appeals granted summary disposition on this claim pursuant to MCR 2.116(C)(10), defendants' motion actually sought only C(7) and C(8) dismissal with regard to count III. If defendants had argued under a C(10) motion, plaintiffs would have been obliged to provide evidentiary support for their claims. However, under a C(8) motion, no such support is required. Thus, concerning the record-keeping activity, we find plaintiffs sufficiently stated a claim on which relief could be granted, and we reverse the Court of Appeals dismissal of this claim. On remand, the parties may explore the factual support for plaintiffs'

---

[23] The dissenting opinion in the Court of Appeals urges the taking of testimony and fact-finding by a special master before a decision is made on defendants' motion. 250 Mich App 715-716. We find that unauthorized because a C(8) motion is based on the pleadings alone. MCR 2.116(G)(5).

allegations that this constitutes a new, unfunded mandate in violation of the Headlee Amendment.

The second post-*Durant I* activity involves special assistance to students having academic difficulty and is embodied in MCL 380.1282, last amended by 1997 PA 181. The amendment, added to the existing statute after *Durant I*, was permissive. That is, it identified special assistance a school district "may" provide to pupils experiencing academic difficulties. Such optional programs are expressly excluded from being "requirements" by MCL 21.234(5)(h), and thus are beyond the scope of the Headlee POUM clause as a matter of law.[24]

Similarly, the statute setting forth the third "new" activity, MCL 380.1277, was amended in 1997 to change the elements that must be included in a school improvement plan. That amendment added some elements and removed some, but the changes in essence simply reworded the criteria

---

[24] Justice Kelly's dissent, correctly pointing out that MCL 380.1282 includes a "meeting" activity that is merely permissive in that statute but mandated in MCL 380.1279, asserts that when these two statutes are read together, the result is a new, mandatory activity. *Post* at 5. We disagree. The mandate of MCL 380.1279 was effective in 1993 and thus any claim that the meeting is a new mandate is barred for the same reasons as the other pre-*Durant I* claims. The meeting guidelines set forth in MCL 380.1282 are, indeed, new to that statute, but they existed verbatim in the pre-*Durant I* version of MCL 380.1279. They, therefore, are not new.

that existed before 1997.[25]  We therefore find that these changes did not impose any "new" or "increased" requirements on the schools as a matter of law.

--------

[25]  For example, before the amendment, school improvement plans had to include:

(a) Identification of the adult roles for which graduates need to be prepared.

(b) Identification of the education and skills that are needed to allow graduates to fulfill those adult roles.

(c) A determination of whether or not the existing school curriculum is providing pupils with the education and skills needed to fulfill those adult roles.

(d) Identification of changes that must be made in order to provide graduates with the necessary education and skills and specific recommendations for implementing those changes.

(e) Development of alternative measures of assessment that will provide authentic assessment of pupils' achievements, skills, and competencies.

(f) Methods for effective use of technology as a way of improving learning and delivery of services and for integration of evolving technology in the curriculum.

(g) Ways to make available in as many fields as practicable opportunities for structured on-the-job learning, such as apprenticeships and internships, combined with classroom instruction.

The 1997 amendment changed these to include:

(a) Goals centered on improving student academic learning.

(b) Strategies to accomplish the goals.

(c) Evaluation of the plan.

(continued…)

In sum, we find plaintiffs sufficiently stated a cause of action regarding the record-keeping requirement, but that neither of the other two post-*Durant I* mandates identified by plaintiffs imposes POUM requirements on the schools. These two requirements are either not "new" or are permissive and thus not "mandates."  Thus, neither runs afoul of the POUM funding requirement.

## VI. CONCLUSION

Except for the record-keeping claim, we affirm the decision of the Court of Appeals, concluding that, except for three activities, the claims presented in the present action are barred by res judicata or release.  Regarding the three post-*Durant I* activities, two are not "new unfunded mandates" because, as pleaded, the activities are simply not new or are merely permissive.  With regard to the record-keeping requirement set forth in MCL 388.1752

---

(continued…)

 (d) Development of alternative measures of assessment that will provide authentic assessment of pupils' achievements, skills, and competencies.

 (e) Methods for effective use of technology as a way of improving learning and delivery of services and for integration of evolving technology in the curriculum.

 (f) Ways to make available in as many fields as practicable opportunities for structured on-the-job learning, such as apprenticeships and internships, combined with classroom instruction.

32

and EO 2000-9, we find plaintiffs have sufficiently stated a claim on which relief may be granted. We reverse the Court of Appeals grant of summary disposition regarding this claim, and remand the case to that Court for further proceedings consistent with this opinion.

Clifford W. Taylor
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

S T A T E   O F   M I C H I G A N

SUPREME COURT

DANIEL ADAIR, a taxpayer of the
Fitzgerald Public Schools, and
FITZGERALD PUBLIC SCHOOLS, et al.,

    Plaintiffs-Appellants,

v                                  No. 121536

STATE OF MICHIGAN, DEPARTMENT
OF EDUCATION, DEPARTMENT OF
MANAGEMENT AND BUDGET, and
TREASURER OF THE STATE OF MICHIGAN,

    Defendants-Appellees.

_____

KELLY, J. (*concurring in part and dissenting in part*).

I agree with the reasoning of the majority in part IV(C) of its opinion as it relates to: (1) the analysis of the record-keeping activity resulting from the interaction of MCL 388.1752 and Executive Order No. 2000-9 and (2) the claims regarding what must be included in school improvement plans under MCL 380.1277.

I further agree with the conclusion of part IV(B) of the majority opinion. The releases signed by the plaintiff school districts not involved in *Durant I*[1] in 1997 were designed to place those districts in a position similar to that of the *Durant I* plaintiffs.

_____
[1]*Durant v Michigan*, 456 Mich 175; 366 NW2d 272 (1997).

However, I cannot agree that the "post-*Durant I*" activities involving special assistance to students having academic difficulty were solely permissive activities in MCL 380.1282 as amended by 1997 PA 181. I respectfully dissent from the majority's holding and would remand the case for further factual development of the claim involving those activities.

Moreover, because I cannot agree with much of the majority's analysis concerning plaintiffs' remaining claims, I respectfully dissent from the conclusion that those claims were barred by res judicata. I would remand the remainder of plaintiffs' claims to the Court of Appeals for further substantive review.

### I. Plaintiffs' "Post-*Durant I* Claims" Involving Special Assistance.

The majority has chosen to find all but three of plaintiffs' claims barred by res judicata. I will discuss the three before proceeding to the remaining claims. As stated above, I agree with the majority's treatment of the alleged obligations under MCL 388.1752 and EO 2000-9, and those under MCL 380.1277.

However, I cannot join the majority's decision regarding the activities required by the 1997 changes to MCL 380.1282, 1997 PA 181. The majority maintains that a substantial number of the activities mandated in the

2

amendment are permissive activities, not included as "state requirements" as described in MCL 21.234(5)(h). However, MCL 380.1279, the statute outlining the requirements for state endorsed diplomas mentioned in MCL 380.1282(2), contains language that affects the review of the meeting discussed by the majority concerning MCL 380.1282. Specifically, one of the mandated activities in MCL 380.1279 is the meeting that the majority found to be merely permissive in MCL 380.1282. *Ante* at 30. See MCL 380.1279(4). When the two statutes are read together, it becomes clear that the allegedly new or increased activities in MCL 380.1282 are mandatory, despite the permissive language in MCL 380.1282.[2]

---

[2]The particularities of MCL 380.1279 also provide an example of the problem created by the majority's decision to use the issuance date of *Durant I* as the cutoff date for preclusion under res judicata. The first 1997 revision of MCL 380.1279 made a number of changes to the language of the state-endorsed high school diploma provision. However, they did not become effective until June 16, 1997, which was after *Durant I* was argued, but before the opinion was issued. A litigant should not be expected to amend a complaint after oral argument while this Court's decision is pending at the risk of having his claim barred by res judicata. Moreover, only a mandate coupled with underfunding will give rise to a Const 1963, art 9, § 29 claim. Therefore, a cause of action concerning these particular 1997 changes could arguably not accrue until at least the 1997-1998 school year when the state failed to fund the mandated activities.

3

## II. Plaintiffs' Remaining "Pre-*Durant I*" Claims

I next address plaintiffs' claims that involve activities mandated by statute or otherwise in existence before this Court's *Durant I* decision on July 31, 1997. I first question whether res judicata can be properly applicable to these claims under the circumstances. In order to invoke res judicata, a court must find that the parties were in privity. In concluding here that the nonparticipating school districts were in privity, the majority focuses on the nature of the declaratory relief sought in *Durant I*.[3]

---

[3]The majority concludes that a taxpayer in a non-*Durant I* school district stands in privity with *Durant I* school district or nonschool district plaintiffs for res judicata purposes. I disagree. As the majority notes, *ante* at 17-18, the outermost limit of the doctrine requires both a "'substantial identity of interests'" and a "'working functional relationship,'" quoting *Baraga Co v State Tax Comm*, 466 Mich 264, 269-270; 645 NW2d 13 (2002). The taxpayer plaintiffs who were not involved in *Durant I* may have interests similar to those of the other plaintiffs. But I fail to see how they have a working functional relationship with the *Durant I* plaintiffs. Moreover, some of the taxpayers may not have been in the school districts during the years preceding the majority's 1997 cutoff date. Could they be bound by the actions of either set of school district plaintiffs? Accordingly, given that the taxpayers are the real parties in interest here, I particularly question the application of res judicata to the non-*Durant I* taxpayers. The majority expresses concern that recognizing the lack of privity here will open the floodgates to repeated litigation of exactly the same claim with different plaintiffs. I acknowledge these concerns. However, rather than rely on a strained application of privity and res judicata, I would address them using the
(continued…)

4

However, I believe that the majority fails to adequately discuss the proper application of res judicata to declaratory judgments. I would find that our judgment in *Durant I* does not preclude the claims that plaintiffs allegedly "failed" to raise in that case.

I reach this conclusion in part through the language of *Durant I* itself. The majority there gave a money judgment to plaintiffs. But all justices agreed that relief in future cases should be solely of a declaratory nature. See *Durant I,* 205-206. In fact, the majority clearly anticipated the continuing need for review and declaratory relief in light of the fact that school mandates and funding are ever changing:

> [Const 1963, art 9, § 32] authorizes taxpayers to file suit in the Court of Appeals to enforce the provisions of § 29. As arduous as the proceedings in this case have been, we have succeeded in deciding many points of law that will guide future decisions. Thus, there is every reason to hope that future cases will be much more straightforward. We anticipate that taxpayer cases filed in the Court of Appeals will proceed to rapid decision on the issue whether the state has an obligation under art 9, § 29 to fund an activity or service. The Court of Appeals would give declaratory judgment on the obligation of the state. If there was such an obligation, we anticipate that the state would either comply with that obligation no later than the next ensuing fiscal year, unless it could obtain a

---

(continued…)
principle of stare decisis, along with possible sanctions pursuant to MCR 2.114.

stay from this Court, or remove the mandate. [*Durant I*, 456 Mich 205-206.]

The *Durant I* majority correctly recognized that, because of the nature of the relief sought, res judicata would not bar future claims concerning alleged mandates similar to those actually reviewed in *Durant I*.

Also pertinent here is the discussion in Restatement 2nd, Judgments, § 33, p 332:

> A valid and final judgment in an action brought to declare rights or other legal relations of the parties is conclusive in a subsequent action between them *as to the matters declared*, and, in accordance with the rules of issue preclusion, as to any issues *actually litigated by them* and determined in the action. [Emphasis added.]

Thus, the general rule concerning declaratory relief is that res judicata applies only to "matters declared" and "any issues actually litigated . . . and determined in the action."

A comment to the Restatement, § 33 continues:

> c. Effects as to matters not declared. When a plaintiff seeks solely declaratory relief, the weight of authority does not view him as seeking to enforce a claim against the defendant. Instead, he is seen as merely requesting a judicial declaration as to the existence and nature of a relation between himself and the defendant. The effect of such a declaration, under this approach, is not to merge a claim in the judgment or to bar it. Accordingly, regardless of outcome, the plaintiff or defendant may pursue further declaratory or coercive relief in a subsequent action. [*Id.,* § 33, comment c, p 335.]

6

Hence, a declaration coupled with no other relief does not bar a later claim or merge with it.

The problem with trying to apply a doctrine to circumstances outside the norm is well illustrated by the troublesome application of res judicata to the facts of this case. Here, the majority concludes that all the "pre-*Durant I*" mandates could have been raised in the earlier *Durant I* litigation. *Ante* at 22-23.

I disagree that the claims here arose out of the same "transaction" for the purpose of applying res judicata.[4] The majority contends that a decision whether factual grouping constitutes a "transaction" for the purposes of res judicata involves a consideration of whether the facts are related in "'time, space, origin, or motivation.'" *Ante* at 22 (citation omitted; emphasis added in majority opinion). As the majority recognizes, a number of the claims in this case involve statutorily mandated activities that came into existence only while the *Durant I* litigation

---

[4]Although it is tangential to my analysis of the issues here, I disagree with the majority's holding that "this Court has accepted the validity of the broader transactional test in Michigan . . . ." *Ante* at 21. It cites *Sewell v Clean Cut Mgmt, Inc*, 463 Mich 569, 575-576; 621 NW2d 222 (2001), and *Dart v Dart*, 460 Mich 573, 586; 597 NW2d 82 (1999), for this proposition. However, in both *Sewell* and *Dart,* we applied the "transactional" test and the "same elements" test simultaneously. *Id*.

was pending.  Yet the majority finds that these claims are related in time, space, and origin.  I disagree.

The statutory language at issue in a number of these claims did not exist when plaintiffs filed suit in *Durant I*.  This fact is an illustration of the unfortunate snail's pace of much appellate process.  However, I would not tie the appellate courts' lack of speed to a finding that claims arising from later statutory enactments were part of the original "transaction."[5]

The new claims may be related to each other in "motivation" and perhaps in "origin".  But a finding that they are related in "time" essentially requires the use of the courts' lengthy *Durant I* deliberations as a vehicle for time travel.  Although interesting from a quantum mechanic's perspective, I would not find that res judicata can be applied to claims by the *Durant I* plaintiffs that

---

[5]I think a more simple analogy may be useful.  In year one, plaintiff is involved in a vehicle accident with defendant.  Plaintiff files suit and defendant responds that he was not negligent.  That claim begins working its way through our court system.  It takes a year to reach the appellate stage.  Ironically, in year two, while the appellate court ponders the initial question of negligence, plaintiff and defendant are involved in a second accident. The same cars, now repaired and on the roadway, are involved.  The first case is decided in favor of plaintiff. However, plaintiff then brings a second suit for negligence arising from the second accident. I doubt the majority would find that the second claim is barred by res judicata. Yet that is essentially what it decides here regarding the *Durant I* plaintiffs.

involve statutory enactments effective after *Durant I* was filed. Res judicata should not be ruled to bar these "later" causes of action.

It took our courts seventeen years to decide the limited issues actually before them in *Durant I*. In light of that fact, I question that the piecemeal amalgamation of claims suggested by the majority would have actually created a "'convenient trial unit.'" *Id.* The majority faults plaintiffs for failing to move to add claims under MCR 2.118(E),[6] to an ongoing declaratory judgment action begun seventeen years before this Court's ultimate decision. I do not. It would serve no useful purpose to require plaintiffs to try to add these claims solely to preserve their right to bring them later.

Plaintiffs raise an argument against ever applying res judicata to claims arising from statutes in existence at the time the *Durant I* complaint was filed. They assert that a new "transaction" arises whenever the Legislature amends statutory funding vehicles, such as 2000 PA 297, and fails to include adequate funding to meet its obligations under § 29. I find the argument persuasive.

Two requirements must be met in a § 29 action: a mandate and a failure to fund. The proposal of a mandate

---

[6] *Ante* at 23 n 17.

9

alone does not form the basis of a claim.  It is only when the mandate is unfunded, or underfunded, that the state has violated § 29.

It is inappropriate to preclude the litigation of all claims relating to changes over time in the funding levels of a mandated program.  .  Such a preclusion would have required the *Durant I* plaintiffs to become mind-readers and to have anticipated all future funding decisions concerning "pre-*Durant I*" mandates.

The majority fails to recognize that a § 29 claim involves both a mandate and a funding decision.  In so doing, it focuses too narrowly on the specific language pleaded in the complaint, rather than on the substance of the underlying claims.

The majority effectively concedes that plaintiffs' counsel in fact made such an assertion.  During oral arguments and in his appellate brief, counsel argued that the state decreased its proportion of funding levels of a mandated program after Durant I. *Ante* at 23 n 16. However, the majority relegates this actual claim to a footnote,

10

without even a discussion of why plaintiffs were required to plead with more specificity.[7]

I question what the purpose of plaintiffs' claims in this declaratory action would be, if not to gain a declaration that the state failed to meet its current funding obligations. Language to this effect is included in plaintiffs' prayer for relief in the second amended complaint. The only logical conclusion from the pleadings is that plaintiffs sought relief because the state decreased the funding levels of a mandated program from that required under § 29.

In addition, the majority intimates that plaintiffs could amend their pleadings to include such a claim. But rather than simply recognizing the actual substance of plaintiffs' claims, the majority forces plaintiffs to jump through yet another hoop. It requires plaintiffs to make a motion on remand under MCR 2.118(A)(2) or (E) to add the claims to those that this Court has already directed the Court of Appeals to entertain. I find this action contrary to the purpose of res judicata generally and of no service to the parties in this dispute.

_____

[7]I am not aware of any declaration by this Court that there are pleading requirements particular to an action claiming relief pursuant to the Headlee Amendment.

11

### III. Conclusion

In conclusion, I agree with the majority's ruling that the school district plaintiffs who were not involved in *Durant I* agreed to be treated similarly to those who participated in *Durant I*. However, I dissent from the majority's disposition of plaintiffs' "pre-*Durant I*" claims for the reasons stated. I would not hold that these claims were barred by res judicata. Instead, I would remand them to the Court of Appeals for review on the merits.

To the extent that the majority has reviewed plaintiff's three "post-Durant I" claims, I agree with the result reached regarding the alleged mandatory activities under MCL 388.1752, EO 2000-9, and MCL 380.1277. However I dissent from the majority's analysis of the activities required under MCL 380.1282. I would instead remand this claim to the Court of Appeals for further factual findings.

Marilyn Kelly

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

DANIEL ADAIR, a taxpayer of
the Fitzgerald Public
Schools, and FITZGERALD
PUBLIC SCHOOLS, et al.,

    Plaintiffs-Appellants,

v                                                            No. 121536

STATE OF MICHIGAN, DEPARTMENT
OF EDUCATION, DEPARTMENT OF
MANAGEMENT AND BUDGET, and
TREASURER OF THE STATE OF
MICHIGAN,

    Defendants-Appellees.

_____

WEAVER, J. *(dissenting in part and concurring in part).*

I respectfully dissent from the majority's conclusion that plaintiffs' claims are barred by res judicata. The majority's broad application of res judicata to cases arising under the Headlee Amendment[1] eviscerates the standing granted to taxpayers under art 9, § 32 of the constitutional amendment and precludes suits in subsequent years for subsequent funding violations of art 9, § 29.

Additionally, I dissent from the majority's conclusion that the release bars claims by those plaintiffs that

---

[1] Const 1963, art 9, §§ 25-32.

signed releases after *Durant I*[2] to receive a portion of the money damages.  More fact-finding is required to determine which claims might be barred by the release.

While I disagree with the majority's analysis of res judicata and the release, I concur with the majority's conclusion that plaintiffs' claim based on record-keeping activities, MCL 388.1752 and Executive Order No. 2000-9, should not be dismissed because plaintiffs have alleged new activities that were not funded as Const 1963, art 9, § 29 requires.

For these reasons, I would reverse the decision of the Court of Appeals and remand this case to that Court for proceedings consistent with this opinion.

I.  The Headlee Amendment and Res Judicata

Const 1963, art 9, § 29 provides in part:

> The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law.  A new activity or service or an increase in the [level] of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs.

---

[2] *Durant v Michigan,* 456 Mich 175; 566 NW2d 272 (1997).

2

Standing to pursue violations of this section, as well as other sections of the Headlee Amendment, is given to all taxpayers in the state.  Const 1963, art 9, § 32 provides:

> *Any taxpayer* of the state shall have standing to bring suit in the Michigan State Court of Appeals to enforce the provisions of Sections 25 through 31, inclusive, of the Article, and, if the suit is sustained, shall receive from the applicable unit of government his costs incurred in maintaining such suit. [Emphasis added.]

Constitutional provisions, including those that comprise the Headlee Amendment, are interpreted according to the "common understanding" that the people would give the provision.  As explained by Justice Cooley:

> "A constitution is made for the people and by the people.  *The interpretation that should be given it is that which reasonable minds, the great mass of people themselves, would give it.*  'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, *the intent to be arrived at is that of the people,* and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, *but rather that they have accepted them in the sense most obvious to the common understanding,* and ratified the instrument in the belief that that was the sense designed to be conveyed.'"  [*Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971), quoting Cooley's Const Limitations, p 81 (emphasis in original).]

Additionally, courts may consider the circumstances surrounding the adoption of the provision and the purpose sought to be accomplished.  *Id.*

3

The majority cites the rule of common understanding and opines that under the rule, the people would have expected that the broad principles of res judicata articulated in the majority opinion apply to cases seeking enforcement of the provisions of the Headlee Amendment. But the majority's application of the rule is disingenuous and its conclusion is unsupported by the language or purpose of the amendment.

Art 9, § 32 gives "*any taxpayer* of the state" standing to enforce the provisions of the Headlee Amendment. This grant of standing is consistent with the amendment's purpose, which, as explained by this Court, is to limit the expansion of legislative requirements placed on local governments:

> The Headlee Amendment was "part of a nationwide 'taxpayers revolt' . . . to limit legislative expansion of requirements placed on local government, to put a freeze on what they perceived was excessive government spending, and to lower their taxes both at the local and state level." [*Airlines Parking, Inc v Wayne Co,* 452 Mich 527, 532; 550 NW2d 490 (1996), quoting *Durant v State Bd of Ed,* 424 Mich 364, 378; 381 NW2d 662 (1985).]

Consequently, it is extremely doubtful that the people of this state would have expected their ability to enforce the Headlee Amendment to be hampered by the broad application of res judicata that the majority imposes. Rather, as

explained below, a "common understanding" of the people would suggest the opposite conclusion—that the Constitution's grant of standing under art 9, § 32 to "*any taxpayer*" is just that—a broad grant of standing that permits *any* taxpayer to pursue actions necessary to enforce the provisions of the Headlee Amendment.

Traditionally, res judicata requires establishing three elements:  "(1) the first action was decided on the merits, (2) the matter contested in the second action was or could have been resolved in the first, and (3) both actions involve the same parties or their privies." *Sewell v Clean Cut Mgmt, Inc,* 463 Mich 569, 575; 621 NW2d 222 (2001), quoting *Dart v Dart,* 460 Mich 573, 586; 597 NW2d 82 (1999).  The majority applies this doctrine so broadly as to eviscerate the standing that art 9, § 32 provides to "any taxpayer" to pursue Headlee violations.

First, the majority's analysis of "privity" is overly broad when applied to Headlee cases.  Privity examines the interests of the parties and considers whether there is a substantial identity of interests between the parties such that the interests of the current plaintiffs were adequately represented by parties in a prior suit—in this case, the plaintiffs in *Durant I*.  The majority reasons that the interest of one taxpayer or local unit of

government "will almost always be identical" to "the interests of all similar local units of government and taxpayers," *ante* at 19; consequently, the majority finds privity between the plaintiffs in *Durant I* and the plaintiffs in this case. Under the majority's analysis, any time that a school district or a taxpayer in a school district raises a Headlee claim, there will be privity between that plaintiff and all other school districts in the state and taxpayers in those school districts. Thus, one taxpayer's decision to pursue a particular Headlee claim may foreclose suit by any other taxpayer who wishes to bring suit to enforce the Headlee Amendment. This erodes the standing granted to *any taxpayer* in art 9, § 32 of the Headlee Amendment.

Second, when examining whether the claims raised in this case could have been raised in *Durant I,* the majority opines that almost all the claims could have, and consequently should have, been raised in *Durant I*. This conclusion is problematic for at least two reasons. First, it is unrealistic to expect the plaintiffs in *Durant I* to add new Headlee claims that arose as *Durant I* dragged its way through the court system for seventeen years. Second, as Justice Cavanagh notes in his dissent, the majority focuses solely on one question when addressing this element

6

of res judicata:  when the mandate being challenged was enacted.   However, in addition to considering when the mandate was enacted, one must also consider when the lack of funding occurred because, as Justice Cavanagh explains, the lack of funding may not occur until some time after the mandate was created .

By applying overly broad privity analysis and by failing to consider *when* the lack of funding occurred, the majority will bar suits by plaintiffs that seek to raise yet unchallenged Headlee violations or to raise Headlee violations occurring in subsequent years.   This is inconsistent with art 9, §§ 29 and 32 and contrary to the people's understanding that any taxpayer would have standing to enforce the Headlee Amendment.   While the people may have understood that a specific taxpayer who raised a specific claim and received a decision on that specific claim could not pursue that claim a second time once that claim had been decided by the courts, the people could not have understood the broad grant of standing to *"any taxpayer"* to mean that one taxpayer's decision to pursue a specific claim precludes another taxpayer from pursuing another Headlee violation that may have existed, but was not raised, in the suit by the first taxpayer. Moreover, the people could not have understood that

7

subsequent suits for funding violations under art 9, § 29 would be barred if the mandate existed at the time another Headlee violation was challenged because this would be contrary to the very intent of that provision, which is to prevent the Legislature in subsequent years from reducing funding or from adding new activities or increasing the level of activities without providing funding.

The majority surmises that its broad application of res judicata is necessary to prevent a "total paralysis of government," *ante* at 25, and to provide finality in the law. However, the majority fails to consider other facts that will provide finality and discourage frivolous law suits. First, as Justice Kelly notes in her dissent, if a second claim by a different taxpayer raises an issue that has already been decided by the Court of Appeals or this Court in a previous suit, courts will be bound or guided by stare decisis to apply the previous decision to the current claim, and the case will quickly be resolved.[3] Second, as we all know, litigation is expensive, and plaintiffs only have an opportunity to recover their costs if they prevail

---

[3] Moreover, it seems unlikely that attorneys will pursue a Headlee claim that has already been clearly resolved by prior case law, unless they are arguing that a change in the law is warranted.

8

on the merits of their suit.  Thus, the cost of litigation will discourage frivolous suits.  Third, there is a one-year statutory period of limitations on Headlee cases.  MCL 600.308a(3).[4]  Thus, the Headlee Amendment is already "workable" without the majority's imposition of an overbroad application of res judicata.

## II.  Release

A school district that was not a party to the *Durant I* suit was permitted to receive a portion of the money damages awarded in that suit, provided that the school district signed a release that stated that the district

> waive[d] any right or interest it may have in any claim or potential claim through September 30, 1997 relating to the amount of funding the district or intermediate district [was], or may have been, entitled to receive under the state school aid act of 1979, 1979 PA 94, MCL 388.1601 to 388.1772, or any other source of state funding, by reason of the application of section 29 of article IX of the state constitution of 1963, which claims or potential claims are or were similar to the claims asserted by the plaintiffs in the consolidated cases known as [*Durant I*].  [MCL 388.1611f(8).]

---

[4] MCL 600.308a(3) provides:

> A taxpayer shall not bring or maintain an action under this section [Const 1963, art 9, § 32] unless the action is commenced within 1 year after the cause of action accrued.

9

Thus, the issue regarding any district that signed a release after *Durant I* is whether any of the claims asserted by that district in this case are barred by the release.

As the majority notes, the scope of the release is controlled by the language of the release, *ante* at 26. The language of the release in the present case is very broad. By it, the district waives "any right or interest it may have in any claim or potential claim through September 30, 1997," MCL 388.1611f(8), relating to the amount of funding it may have been entitled to receive under the school aid act of 1979 or any other source of state funding. Thus, under the language of the release, there may be claims that are barred by the release. However, I would not dismiss any claims at this time. Additional fact-finding is required to determine which plaintiffs in the present suit signed releases in *Durant I* and to determine which claims, if any, arose before September 30, 1997. When addressing this latter question, one must consider not only when the mandate being challenged was enacted, but also when the failure to fund occurred.

While this may potentially lead to disparate results between districts that were parties to the suit in *Durant I* and districts that were not parties to the suit, but,

10

instead, participated in the damages award by signing a release, these disparate results can be tolerated in the present case because the circumstances are highly unusual in two regards. First, money damages were awarded in *Durant I* despite the fact that damages are not provided for in § 29 or § 32 of the Headlee Amendment. See *Durant I,* 456 Mich 221-233 (opinions of Brickley, J., and Weaver, J., each concurring in part and dissenting in part).[5] Second, the school districts that signed releases were not actual parties to the law suit, but were, nonetheless, allowed to receive a portion of the damages if they signed a release. Thus, they should be bound by the release that they signed.

## III. Conclusion

I dissent from the majority's conclusion that plaintiffs' claims are barred by res judicata. Such a conclusion is contrary to the "common understanding" that the people would give the Headlee Amendment, as well contrary to the purpose or the language of the amendment. The majority's application of overbroad res judicata principles to plaintiffs' Headlee claims eviscerates the standing granted to taxpayers under art 9, § 32 and will

---

[5] I would have concluded that money damages were not authorized by the Headlee Amendment and that only declaratory judgment was appropriate. *Durant I,* 456 Mich 232-233.

preclude suits for subsequent funding violations of art 9, § 29. Further, at this time, I would not conclude that the claims of plaintiffs that signed the release are barred by the release because more fact-finding is required before that determination can be made. Consequently, I would reverse the decision of the Court of Appeals and remand this case to that Court for proceedings consistent with this opinion.

Elizabeth A. Weaver

**S T A T E   O F   M I C H I G A N**

**SUPREME COURT**

DANIEL ADAIR, a taxpayer of
the Fitzgerald Public
Schools, and FITZGERALD
PUBLIC SCHOOLS, et. al.,

    Plaintiffs-Appellants,

v                                                      No. 121536

STATE OF MICHIGAN, DEPARTMENT
OF EDUCATION, DEPARTMENT OF
MANAGEMENT AND BUDGET, and
TREASURER OF THE STATE OF
MICHIGAN,

    Defendants-Appellees.

_____

CAVANAGH, J. (*dissenting*).

Although I agree with the majority that Michigan uses the same transaction test to determine whether claims are barred by res judicata, I disagree with the majority's application of that test to the facts of this case. The majority holds that plaintiffs' claims are barred by res judicata because they arose from the same transaction as the claims in *Durant v Michigan*, 456 Mich 175; 566 NW2d 272 (1997) (*Durant I*), and, thus, could have been filed while that litigation was pending. I disagree.

In *Sewell v Clean Cut Mgmt, Inc*, 463 Mich 569, 575; 621 NW2d 222 (2001), this Court held that res judicata bars

a second action when (1) the first action was decided on its merits, (2) both actions involve the same parties or their privies, and (3) the issue in the second case was, or could have been, resolved in the first case.  I agree with the majority that *Durant I* was decided on its merits and that both actions involve the same parties or their privies.  However, I do not agree that plaintiffs' claims could have been resolved in *Durant I*.

Plaintiffs' claims are based on a lack of funding for certain activities and services.  The majority examines each activity or service and focuses on when each activity or service was mandated in order to determine whether the claim regarding that service is barred by res judicata.  This examination misses the point.  Plaintiffs' action challenged funding under the second sentence of Const 1963, art 9, § 29, frequently referred to as the "prohibition on unfunded mandates" (POUM) clause.  As noted by the majority, the POUM clause requires the state to fully fund any new or increased activities or services mandated or increased after 1978.  The POUM clause provides:

> A new activity or service or an increase in the [level] of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any

2

necessary increased costs. [Const 1963, art 9, § 29.]

A challenge under the POUM clause is to the *funding* for the mandate, not to the mandate itself. Thus, when the activity was mandated is important to determine whether it was enacted after the 1978 base year, but it is not useful in determining whether the current funding challenge is barred by res judicata. The majority's approach examines whether each mandate existed while *Durant I* was pending; that is not the operative question. The controlling question is whether the alleged funding deficiency relating to that mandate existed while *Durant I* was pending.[1]

Plaintiffs' claims could not have been raised while *Durant I* was pending because the claims are based on the funding established in 2000 PA 297, which was not enacted

---

[1] Although not necessary to my analysis, I note that the majority asserts that the *Durant I* plaintiffs could have amended their pleadings at any time during the seventeen-year pendency of their suit. While MCR 2.118(E) provides for liberal amendment of pleadings, it is nonsensical to suggest that parties should move for leave to amend their pleadings because of a change in the law after judgment has been entered. Before today's opinion, this Court had not recognized the possibility that a trial court may grant leave to amend pleadings after judgment has been entered. Nor had this Court examined whether a party may amend the pleadings while a case is pending on appeal. I do not agree with the majority's holding that a party may amend its pleadings at any time before this Court issues a final decision.

3

until three years after the resolution of *Durant I*. The majority fails to recognize that plaintiffs pleaded that the state decreased its proportion of funding levels of a mandated program after *Durant I*. Because the funding challenge arose after *Durant I*, plaintiffs' claims are not barred by res judicata.

Although it would have been helpful had plaintiffs' complaint directly referred to 2000 PA 297, explicit reference to the funding statute is not required in an action in this state. Plaintiffs' second amended complaint contained three counts, each alleging, "Defendant state has failed to pay plaintiff school districts for the necessary increased costs of providing [the/these/said] activities and services [set forth in subparagraphs 15 A-H, 19 A-G, or 22 A-L above]." This is clearly sufficient to satisfy Michigan's fact-pleading requirements.

MCR 2.111(B) requires a complaint to contain the following:

> (1) A statement of the facts, without repetition, on which the pleader relies in stating the cause of action, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend . . . .

This rule does not require, nor has this Court ever required, a complaint to specifically state the statute

4

under which the cause of action arises.  MCR 2.111(B) only requires that the complainant provide the facts and "the allegations necessary reasonably to inform the adverse party of the nature of the claims . . . ."  The second amended complaint in this case did exactly that, it outlined activities and services that were mandated under specific statutory sections and then alleged that the state failed to fund these activities and services.

Further, there are no specific pleading requirements for claims filed under the Headlee Amendment.  This Court recently examined the pleading requirements for Headlee Amendment cases and issued an order vacating the Court of Appeals order and allowing the plaintiffs to amend their pleadings.  *Duverney v Big Creek-Mentor Utility Auth*, 677 NW2d 886 (2004).  Because today's majority opinion creates a new requirement that complaints specifically refer to the statute on which the claim is based, plaintiffs in this case should certainly be allowed to amend their pleadings.  Because I do not agree that a party must specifically refer to the funding statute in question, I would not dismiss plaintiffs' claims on this technicality.  Therefore, I respectfully dissent.

Michael F. Cavanagh

5